692 So.2d 168 (1997)
INQUIRY CONCERNING a Judge No. 95-412, re June Laran JOHNSON.
No. 87482.
Supreme Court of Florida.
April 17, 1997.
*169 Frank Kaney, Chairman and Thomas C. MacDonald, Jr., General Counsel, Tallahassee, Timothy W. Ross, Special Counsel, Coconut Grove, and Lauri Waldman Ross, Special Counsel, Miami, for Judicial Qualifications Commission, Petitioner.
Bruce S. Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, for Respondent.
PER CURIAM.
The Judicial Qualifications Commission (JQC) has filed with this Court a recommendation that June LaRan Johnson be removed from her position as a county court judge in Broward County. We have jurisdiction under article V, section 12(f) of the Florida Constitution.
In support of its recommendation, the JQC made the following findings of fact:
1. June LaRan Johnson is a County Court Judge for the Seventeenth Judicial Circuit, Broward County, Florida. She has served in that position since her election to the bench in 1982.
2. On or about September 18, 1995, Joann Headrick, a secretary for State Attorney Michael Satz (Broward County) fielded a telephone call from an irate citizen who complained about Judge Johnson's handling of Defendant William Rodda's pending DUI cases. (T. 33-34). Ms. Headrick ran a computer report, determining that Judge Johnson had reset one case some 33 times between July 1991 and September 18, 1995, and had re-set the arraignment of Mr. Rodda in the second (1992) case some 7 times after the case was assigned to her and after it was set for trial by the prior judge. (T. 35-39; 46; Pet. Ex. 2). Ms. Headrick reported this to SA Satz, who assigned ASA Howard Scheinberg to investigate why the cases were so old. (T.44; 50-52).
3. Howard Scheinberg is an assistant state attorney in charge of the Broward Court division. He reviewed a series of Judge Johnson's cases and issued a status report to Mr. Satz on aged cases in Judge Johnson's division on September 22, 1995. (T. 52-55, Pet.Ex. 3). Mr. Scheinberg testified that an arraignment is the first proceeding following arrest, that typically arraignments were reset only once or twice when necessary for a Defendant to obtain legal counsel. In contrast, Judge Johnson had a practice of resetting arraignments repeatedly over a period of years. Mr. Scheinberg concluded that "the majority of cases pending before Judge Johnson have an inordinate number of continuances," and that the procedure Judge Johnson used of "repeatedly resetting what the Judge terms as `arraignments' appeared to be geared towards minimizing her reported cases for statistical purposes." (T. 114-15, Pet.Ex. 3). Mr. Scheinberg explained that the clerk's statistics generated to measure a judge's caseload are triggered by a plea entered on the court's docket, thereby generating a trial setting. If a case is constantly re-set for arraignment, it would not show up as part of a judge's pending caseload. (T. 245-46).
4. The information obtained by the State Attorney's Office was conveyed to Judge Dale Ross, Chief Judge, 17th Judicial Circuit who met with Judge Johnson in approximately October 1995. (T. 497). Chief Judge Ross told Judge Johnson that she was not to reset any further arraignments. (T. 506-07). He termed Judge Johnson cooperative and said that she agreed not to do so in the future. (T. 527).
5. Sandra (Sandi) Langley has been employed by the Clerk of Broward County for 25 years, in the misdemeanor division. During the years 1994 and 1995, she was assigned to Judge Johnson (T. 266). As the clerk in the "hot seat," Ms. Langley actually marked the files.

*170 6. Clerk Langley only kept docket sheets as far back as September, 1994. Therefore, she could not testify with regard to records earlier than that date. (T. 268). After September 1994, Clerk Langley testified that the Judge directed her to enter dates on the disposition sheet which materially varied from the actual date of the plea. At the beginning, Clerk Langley wrote up each plea to specifically reflect that the defendant was being convicted nunc pro tunc to an earlier date. She stopped when the Judge told her that she didn't want pleas written up that way. (T. 354). Instead, Judge Johnson announced "Today's date is" and gave a date which differed from the actual date of the hearing. (T. 272-74). When attorneys used the term "retroactive," Judge Johnson would say "It's not retroactive" and give the fictitious date. (T. 354). In some instances where Ms. Langley had already noted the actual date of the hearing on her paperwork, she would have to cross through that date and enter the date the Judge directed. (T. 272-74). Judge Johnson ofttimes referred to these backdates as "quantum leaps" after a favorite television show. (T. 287).
7. When Judge Johnson took a plea in a DUI case, Ms. Langley would mark the file and fill out several documents. These included a disposition sheet, an original of which stayed with the file, while one copy was provided to the probation department and 2 copies to the Defendant. The citation or ticket was forwarded to the Department of Motor Vehicles in Tallahassee. (T. 270).
8. When a driver is convicted of a DUI, the Department of Motor Vehicles ordinarily dates revocation of the driver's license from the date of conviction (which is taken from the citation). Entry of an improper, earlier date on the citation gives the driver more time to use the license and thus can have serious consequences for the Department. (T. 474-5).
9. Pursuant to Judge Johnson's directions, Clerk Langley backdated the date of convictions to earlier dates on the citations forwarded to the Department. However, nothing on the citation reflected that backdates, instead of actual conviction dates, were being used. (T. 363).
10. Clerk Langley became concerned over the perception her supervisors might have that she was not performing her job, because the records she dated back pursuant to Judge Johnson's instructions made it look as though she was not turning in her records in a timely fashion. She brought this to the attention of her supervisor. She was told that "[she] was to do what the Judge told [her] to do." (T. 276). On her own initiative, Clerk Langley began to record the Judge's directions to her in dating the files by referencing the backdates as made "per Judge Johnson." (T. 355).
11. In 1994 and 1995, proceedings in Judge Johnson's courtroom were transcribed on tape. When Judge Johnson wanted to stop transcription, she either signaled Clerk Langley by tapping or told her to "push the button." (T. 269). On several occasions, when Judge Johnson directed Clerk Langley to enter a backdate, she also directed her to turn off the tape. (T. 282-284).
12. Judge Johnson made numerous statements of record reflecting a conscious awareness of the impropriety of her actions, as well as her intention to mislead the Department of Motor Vehicles:
A. On March 14, 1995, the Judge directed clerk Langley to backdate paperwork to July 20, 1994, indicating "I don't nunc pro tunc because they don't accept nunc pro tuncs;" (Pet.Ex. 8, pp. 16-17)
B. On May 5, 1995, the Judge announced "Today is January the 25th, 1995" and directed clerk Langley to correct the already-marked paperwork accordingly. When an assistant state attorney asserted her confusion, and questioned the Judge about "dating him back," the Judge responded "I'm not nunc pro tuncing him" because "I can't date it back, but I can make it another date ... I can't say `Nunc Pro Tunc' because they'll toss it back" and explained further that "It's the only way *171 to get around the Department of Motor Vehicles;" (Pet.Ex. 10, pp. 19-20).
C. On May 9, 1995, Judge Johnson stated that she knew she couldn't nunc pro tunc a drivers license suspension to the time of the administrative suspension, and would only date the file only back to November 8,1994 because "they won't believe anything further back than that on September;" (Pet.Ex. 12, p. 7).
D. In response to an attorney's indication on May 15, 1995 that the Judge had offered a nunc pro tunc as part of a plea, Judge Johnson responded that "I don't nunc pro tunc. I just make it a different day." (Pet.Ex. 13, P. 9).
13. Judge Johnson also made numerous statements of record reflecting the increasing sense of urgency with which she was acting:
A. On November 7,1995, in response to an attorney's request to keep her plea offer (involving backdating) open, Judge Johnson indicated that "I'm trying to close stuff out." (Pet.Ex. 23, p. 6).
B. On November 13, 1995, in response to an attorney's refusal to plead his client, Judge Johnson sought to encourage pleas by "mak[ing] today's date 1/19/95." (Pet.Ex. 28, pp. 2-3).
C. On November 17, 1995, Judge Johnson stated "What I'm going to do is make a final offer today. I'm trying to close out stuff for the New Year's...." (Pet.Ex. 32, p. 3). As to her "final offer," Judge Johnson indicated that "if he takes the plea before Tuesday I will transmit the date to Tallahassee as being April the 4th, which means that his suspension would be up. At least the criminal suspension, I don't know what's going on with the other suspension." (Id. at 4). As to her knowledge of the impact [of] her action, Judge Johnson stated that the Defendant would then "be eligible to walk into the license bureau, just get a regular driver's license like nothing ever happened the day we took the plea." (Id.). Judge Johnson concluded by telling the defense attorney that "you and I both know that you're not going to get that offer anywhere else in the world." (Id.).
D. On December 4, 1995, when the defendant accepted a plea after Judge Johnson asked if he'd "like until the 15th to think it over," Judge Johnson stated, "Absolutely too tempting, wasn't it? I know. It's very difficult to turn it down. I intend it that way." (Pet.Ex. 38, pp. 2-3).
E. On December 7, 1995, Judge Johnson offered a plea which included back-dating to June 6, 1995 "if he takes it today, before 2:30" (Pet.Ex. 40, p. 7). She stated that the plea was "only going to be open today, because I don't have time to play with you next week." (Id.). at 6).
F. In December 1995, Judge Johnson told still other Defendants that the plea she was offering  which would allow them to be eligible for drivers licenses immediately  was good for "today only," or "right now." (Pet.Ex. 41, p. 4; Pet.Ex. 31, p. 3).
14. But for Judge Johnson's instructions, the paperwork would have been dated to accurately reflect the date of each Defendant's plea. (T. 300-01).
15. After Judge Johnson stopped resetting arraignments, pursuant to the instructions received from Chief Judge Ross, the amount of backdated pleas that she accepted increased substantially from four in October 1995 to twenty in November 1995. (T. 91).
16. The actual backdating of files was discovered in late November 1995 when Debbie Lesniak, an employee of the Broward County probation department, noticed a discrepancy between the dates of the disposition sheets being turned in by probationers as they came from the courthouse and the dates that the sentencing hearings actually transpired. Ms. Lesniak was concerned that her probationers might have insufficient time to comply with their conditions of probation, which might result in jail time. (T. 378-87; 410-12). Ms. Lesniak had never experienced such a problem before and, accordingly, reported it to her supervisor, Debbie Garr. (T. 424-25). *172 Ms. Lesniak and Garr jointly sent a probation officer to inquire. (T. 413, 430-32, 482). Judge Johnson told the officer to leave the papers and "it would be taken care of." (T. 432). The Judge did not thereafter return any of this paperwork to the probation department. (T. 432).
17. Ms. Garr and the court administrator brought the information to the attention of Judge Johnson's supervisors and the State Attorney. (T. 483-84). The Chief Judge transferred Judge Johnson out of the criminal division pending further investigation. (T. 528).
18. According to the testimony, the amount of files backdated pursuant to Judge Johnson's directions ranged from 42 to 57. (T. 66-67; 484).
19. While Judge Johnson was serving in criminal misdemeanors, she consistently maintained one of the lowest case loads in the division. Within two weeks of her transfer, the amount in this division increased by 259 cases. (T. 88, 119-20; 500-04).
20. Jill Tavlin Schwartz, an assistant general counsel with the Department of Highway Safety and Motor Vehicles, testified as an expert witness in drivers licensing law. (T. 436-37). Ms. Schwartz was asked to trace the Department's treatment of defendants in seven sample files received from Judge Johnson's court. (T. 438). Citations transmitted by Judge Johnson's clerk at her direction gave the backdate as the defendants' actual date of conviction. All were recognized and given effect by the Department. (T. 442). On one occasion the clerk failed to follow Judge Johnson's direction and mistakenly marked a citation "nunc pro tunc." The date given was not honored by the Department, in accordance with existing practice. (T. 442-44). Ms. Schwartz opined that as a result of the Judge's backdating practice, defendants either suffered no license revocations at all or served shortened revocation periods. Judge Johnson thus caused the Department to "impose illegal revocation periods and ... allow[ed] drivers to be licensed contrary to public safety and contrary to the mandates of our statute...." (T. 444-45).
21. The Commission heard from three attorneys specializing in D.U.I. practice, on the Judge's behalf: Michael Catalano, Bobby Reiff and Craig Satchell. The gist of their testimony was that backdating was common practice among judges, and/or was legally justifiable on the basis of double jeopardy (T. 763, 821). These witnesses, however, admittedly knew of no other judges who backdated documents. Additionally, the Commission has examined the transcripts of record and finds no mention of double jeopardy as a basis for any of the pleas.
22. Three circuit court judges in Broward County, including Chief Judge Dale Ross, testified as to Judge Johnson's good reputation/character in the community. All of these witnesses described Judge Johnson as a nice person, and/or a "human" judge. However, each of these admitted knowing little or nothing about the charges at issue, and voiced grave concerns regarding the described conduct, its impropriety, as well as its tendency to discredit the judiciary in the eyes of the public. (T. 548-49, 551; 555; 608-19; 852-65).
23. The record shows and the Commission finds by clear and convincing evidence that Judge Johnson circumvented the Department of Motor Vehicles, that she did so knowingly and intentionally and that her actions corrupted the official driving records of the State of Florida.
Judge Johnson did not testify. Before this Court, she has accepted the JQC's findings of fact except for its characterization of her motive and intent. She asserts that her acts were not prompted by corrupt motive. She says that her "single error in legal judgment, though repeated 42-57 times, represents but one mark on an otherwise unblemished fourteen-year judicial career." Thus, she suggests that the appropriate discipline for her misconduct should be the imposition of a public reprimand personally administered before this Court.
We cannot dispute Judge Johnson's otherwise unblemished judicial record. However, *173 her knowing and repeated acts of falsifying public records strike at the very heart of judicial integrity. We are compelled to the conclusion that Judge Johnson must be removed from office.
There can be no question that Judge Johnson knew what she was doing. She acknowledged on the record that if she merely backdated the records nunc pro tunc, the Department of Highway Safety and Motor Vehicles (Department) would not recognize the earlier date. She knew her actions would affect the length of drivers' license suspensions. The backdating of these records was not a single act of misjudgment but rather a knowing falsification which was repeated many times. To make matters worse, she ordered court personnel to assist in changing the records.
Many people are killed or injured on the highways of Florida each year as a result of persons driving under the influence of alcoholic beverages or prohibited chemical substances (DUI). The legislature has responded to this serious social problem by imposing strong sanctions against those convicted of DUI, including the suspension of their licenses to drive motor vehicles. The actions of Judge Johnson were designed to thwart the proper imposition of these suspensions. The consequences of Judge Johnson's actions were explained by Jill Schwartz, an assistant general counsel of the Department:
Q. [W]hat effect did (Judge Johnson's procedure) have on the Department of Motor Vehicles?
A. We imposed illegal revocation periods and we, in fact, allowed drivers to be licensed contrary to public safety and contrary to the mandate of our own statute. We allowed drivers to be licensed when, in fact, they had not had their licenses revoked for six months.
We agree with the JQC that by her conduct Judge Johnson committed a fraud on the Department. It makes little difference whether she was motivated by a desire to reduce her case load or by humanitarian reasons. The fact that her alteration might have been corrected through an appeal is of no consequence. Her conduct speaks for itself. A person committing acts of this nature cannot be permitted to remain a judge.
Accordingly, we direct that June LaRan Johnson be removed from the office of county court judge effective upon this opinion becoming final.[1]
It is so ordered.
KOGAN, C.J., and OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
SHAW, J., dissents with an opinion, in which ANSTEAD, J., concurs.
SHAW, Justice, dissenting.
Judge Johnson's serious error in judgment is not justifiable and deserves punishment, but removal is too harsh a sanction. I would apply the recently amended provision of the Florida Constitution[2] to tailor a sanction more suitable to her offense.
To call Judge Johnson's conduct unredeeming and to say that she is unfit for judicial office confuses a misguided abuse of judicial discretion with malevolent misuse of judicial power. She committed one error in judgment  and although she committed it repeatedly, her openness convinces me that she was oblivious to the seriousness of her impropriety.
The record shows Judge Johnson has served honorably for fourteen years and she is respected by her colleagues. I am persuaded that she did not act with corrupt *174 motive, and I do not believe her wrongs are beyond redemption. In my view, her misguided attempt to circumvent the mandatory license revocation statute deserves more punishment than a public reprimand, but should not lead to her judicial demise. It seems inequitable to remove Judge Johnson when Judge Colby received a public reprimand for lying in open court, falsifying records, and convicting DUI defendants without a plea or trial in cases where the defendants failed to appear. See In re Colby, 629 So.2d 120 (Fla.1993).
The new amendment recognizes the appropriateness of a middle ground between a public reprimand and removal. While it would be unfair to apply new and onerous changes in the law to conduct which preceded the law, I would apply the new amendment here to benefit Judge Johnson. See State v. Lavazzoli, 434 So.2d 321, 323 (Fla. 1983) (holding that "disposition of a case on appeal is made in accordance with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered" unless a substantive right is altered). I would reject the JQC's removal recommendation and suspend Judge Johnson for six months.
ANSTEAD, J., concurs.
NOTES
[1] We need not decide whether the recent constitutional amendment to article V, section 12 of the Florida Constitution which now permits the suspension of a judge in addition to other sanctions applies to Judge Johnson because we conclude that removal is the only suitable discipline.
[2] The recent amendments to Article V, § 12 of the Florida Constitution, relating to judicial discipline were effective January 7, 1997, and reflect the following change to section 12(a)(1):

For purposes of this section, discipline is defined as any or all of the following: reprimand, fine, suspension with or without pay, or lawyer discipline.
And section 12(c):
(1) The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission....