# Supreme Court of Florida

_____

No. SC14-1582

_____

**INQUIRY CONCERNING A JUDGE, NO. 14-255 RE: JOHN C. MURPHY.**

[December 17, 2015]

PER CURIAM.

This matter is before the Court for review of the recommendation of the Florida Judicial Qualifications Commission that Judge John C. Murphy be disciplined as follows: a public reprimand, suspension without pay for 120 days, a fine of $50,000 plus costs, continued participation in a mental health therapy program until successfully discharged, and completion of Phase I of the Judicial Education Courses in the Florida Judicial College New Judges Program at his own expense and without receiving continuing judicial education credit. We have jurisdiction. See art. V, § 12, Fla. Const. Pursuant to our constitutional authority, we reject the Judicial Qualifications Commission's recommendation and instead remove Judge Murphy from office for violations of the Code of Judicial Conduct and Rules of Professional Conduct by his misconduct on June 2, 2014.

Judge Murphy's misconduct includes the following: (1) threatening to commit violence against an assistant public defender; (2) engaging in a physical altercation with counsel; and (3) resuming his docket while defendants were without counsel. This egregious conduct demonstrates his present unfitness to remain in office. Furthermore, where a judge's actions erode public faith in the courts, removal is appropriate. Judge Murphy's grievous misconduct became a national spectacle and an embarrassment to Florida's judicial system. We conclude that, through his misconduct, Judge Murphy surrendered his privilege to serve in our court system.

## BACKGROUND

The Florida Constitution establishes the Judicial Qualifications Commission (JQC), an independent entity with two parts, an Investigative Panel and a Hearing Panel, to investigate and hear allegations of professional misconduct by Florida judges. The Investigative Panel investigates alleged misconduct and files formal charges. The Hearing Panel subsequently hears evidence on the charges and makes findings, conclusions, and recommendations on both the misconduct and appropriate discipline. Art. V, § 12(b), Fla. Const.

We may accept, reject, or modify the Hearing Panel's findings, conclusions, and recommendations. Art. V, § 12(c)(1), Fla. Const. Although the Hearing Panel in this case recommended discipline short of removal, the Florida Constitution

- 2 -

gives this Court the responsibility to determine appropriate discipline, which includes removal from office.  Id.; see In re Sloop, 946 So. 2d 1046, 1049 (Fla. 2006); In re Henson, 913 So. 2d 579, 589 (Fla. 2005).

On August 13, 2014, the JQC filed its Notice of Formal Charges against County Court Judge John C. Murphy of the Eighteenth Judicial Circuit in and for Brevard County for his behavior during court proceedings.  A majority of the JQC's Investigative Panel found that probable cause existed for charges based on Judge Murphy's alleged misconduct of threatening violence against an assistant public defender, leaving the bench to meet the assistant public defender in the hall to engage in a physical scuffle, returning to the bench to call cases in which defendants were represented by the Public Defender's Office and were without the presence of their attorney, and inducing some of the defendants to waive speedy trial rights.  The JQC asserted in its Notice of Formal Charges that Judge Murphy's conduct violated Canons 1, 2A, 2B, 3A, 3B(2), 3B(4), and 5G of the Code of Judicial Conduct.

On August 13, 2014, Judge Murphy filed his answer to the Notice of Formal Charges.  Judge Murphy maintained that he did not become frustrated because the assistant public defender refused to waive speedy trial, but rather because counsel "repeatedly refused to make any announcement to the court regarding the wishes of several clients—whether it be to proceed to trial, to enter a plea, or to waive the

right to a speedy trial." Judge Murphy denied that he induced any defendant to waive speedy trial rights.

The Hearing Panel heard this matter on March 30 and March 31, 2015. A portion of the courtroom video from the incident was played for the Hearing Panel. The video showed Judge Murphy's verbal altercation with assistant public defender Andrew Weinstock after Mr. Weinstock refused to waive speedy trial for his client. Judge Murphy stated, "You know if I had a rock, I would throw it at your [sic] right now. Stop pissing me off. Just sit down." When Weinstock refused to sit down, asserting his right to stand and represent his clients, Judge Murphy responded, shouting: "I said sit down. If you want to fight, let's go out back and I'll just beat your ass." The two men left the courtroom and met in the hall.

Although there is no video of the events that occurred in the hallway, the courtroom audio captured Judge Murphy remarking, "Alright you, you want to fuck with me?" and sounds of a scuffle. Mr. Weinstock subsequently requested that Judge Murphy be arrested for hitting him twice in the face, but no arrest was made. There was no evidence, other than his own testimony, that Mr. Weinstock had been hit, and there is no video to confirm what occurred in the hallway. Upon Judge Murphy's return to the courtroom, he called the following cases in which the

defendants were represented by the Public Defender's Office, but no assistant public defender was present:

1.  State v. Rounkles.  Judge Murphy gave the defendant options, either set the charges for trial or waive speedy trial.  After the defendant stated he wanted his case done as fast as possible, Judge Murphy set the case for trial.

2.  State v. Samperi.  After the defendant told the court that his lawyer had not returned his phone calls, Judge Murphy responded, "I'm sorry.  Not all public defenders do that."  Judge Murphy later suggested that "all of you that have a complaint about the public defender, if you'd call the Public Defender's Office and make the complaint or, even better, write a letter and send it to the Public Defender's Office . . . I think that would help."  Judge Murphy asked the defendant if he wished to have the public defender removed from his case, to which the defendant said, "I think that's evident, sir."  Judge Murphy removed the public defender and took testimony from the alleged victim in the case, the defendant's girlfriend, who wanted contact with the defendant.  Judge Murphy lifted the no-contact order and instead ordered no unconsented contact.  The defendant asked for a continuance.  Judge Murphy set a new court date on the docket and reappointed the public defender.

3.  State v. Simpkins.  Judge Murphy announced the waiver of speedy trial for the defendant's violation of community supervision charge even though the

defendant did not state her intent to waive speedy trial nor did she request a continuance.

4. <u>State v. Spikes</u>. The defendant stated that he wanted to resolve his resisting arrest charge. Judge Murphy asked the defendant if he wanted to relieve the public defender and represent himself instead; the defendant answered in the affirmative and pled no contest to the charge. Judge Murphy accepted his plea and ordered him to pay court and investigative costs.

5. <u>State v. White</u>. Judge Murphy offered the defendant to have her DUI trial the following week or to waive speedy trial. The defendant asked for a speedy trial, which Judge Murphy so scheduled.

6. <u>State v. Agnello</u>. The defendant agreed to waive speedy trial after Judge Murphy told the defendant that he could either go to trial not knowing who his lawyer would be or ask for a continuance.

7. <u>State v. Anderson</u>. When asked by Judge Murphy what he wanted to do with his DUI case, the defendant said that he had "no idea what to do in this situation. I haven't had a chance to speak to my public defender. And, now, I don't have a public defender." Judge Murphy told the defendant that he might have a chance to talk to a public defender if he waived speedy trial. The defendant then waived speedy trial.

8.  State v. Barbour.  The defendant told the court that he was hoping to resolve his two counts of assault on a law enforcement officer and one count of disorderly conduct.  Judge Murphy asked the State if it wanted to make him an offer.  The State made an offer, but the defendant rejected it, stating that he did not understand the offer.

The Hearing Panel also heard testimony from several witnesses, including Judge Murphy and Andrew Weinstock.  Suzanne Carter was seated in the back of the courtroom during the incident.  When Judge Murphy and Mr. Weinstock entered the hallway, Ms. Carter saw Judge Murphy grab Mr. Weinstock's collar with his left hand and raise his right arm as if he were going to punch Mr. Weinstock.  She did not see a punch land because the door closed.  Ms. Carter heard "a bunch of punch, punch," and Judge Murphy using expletives, including "fuck."  Ms. Carter recalled the courtroom deputy going into the hallway after the first or second punching sound she heard.  In addition to what she believed were three punches, Ms. Carter also heard sounds of a scuffle.

Andrew Weinstock testified that he was assigned to Judge Murphy's courtroom about three months prior to the incident.  Mr. Weinstock described his relationship with Judge Murphy as adversarial, high stress, and very mercurial.  From time to time they would have testy exchanges.  Mr. Weinstock recalled that on other occasions prior to the date of the incident, Judge Murphy had told him,

"Let's go out in the back hallway and discuss it."  According to Mr. Weinstock, taking a lawyer into the hallway to chat is a regular occurrence in Brevard County, although it had only happened to him one other time with another judge about ten years before.

Mr. Weinstock stated that although Judge Murphy was "clearly angry" and said he was going to "beat [Mr. Weinstock's] ass," Mr. Weinstock did not think the Judge would follow through.  Mr. Weinstock went into the hallway expecting to have a discussion in which Judge Murphy would yell at him and the two would come to an agreement about how to handle the remaining cases.  Mr. Weinstock testified that he went through the door and into the hallway before Judge Murphy.  Mr. Weinstock recalled Judge Murphy's left arm pinning him against the wall and alleged that he was punched twice with Judge Murphy's right arm.  Mr. Weinstock further testified that before Judge Murphy could hit him a third time, two deputies pulled Judge Murphy off of him.  Mr. Weinstock claimed that he had a bruise on his face which did not appear in the photographs taken afterwards.  Mr. Weinstock denied punching Judge Murphy.

Judge Murphy testified that Mr. Weinstock was consistently rude to defendants and rude and disrespectful to Judge Murphy on a regular basis.  Judge Murphy and Mr. Weinstock at times would have discussions in the courtroom or bench conferences, and had gone into the hallway on one prior occasion to discuss

whether appearance by a client at docket sounding was mandatory. Judge Murphy agreed that he was in a very high state of anger during the incident. Judge Murphy testified that he regretted his words and actions.

Judge Murphy recalled that he entered the hallway before Mr. Weinstock and alleged that Mr. Weinstock was the aggressor, hitting Judge Murphy in the chest. Judge Murphy remembered having two hands on Mr. Weinstock at all times and that he "only took defense actions." Judge Murphy recalled Deputy Byron Griffin separating the two combatants after a short scuffle during which Judge Murphy attempted to fend off Mr. Weinstock and force him to submit by swinging Mr. Weinstock off balance and using profanity.

Judge Murphy testified that he resumed his docket without Mr. Weinstock because Mr. Weinstock's clients were also his clients and because he wanted to make sure everyone received fair representation. When asked how they could be his clients, Judge Murphy said, "This is county court. It's people's court. . . . They're my people." Judge Murphy admitted that the defendants he dealt with after the incident were not pro se and that he treated them like pro se defendants. He also admitted that resuming with the defendants' cases was "clearly wrong" and waiting for a new public defender to arrive before proceeding would have been a better course of action.

Deputy Griffin testified that he did not think there would be a physical altercation, even though he heard Judge Murphy ask Mr. Weinstock if he wanted to fight and say that he would beat Mr. Weinstock's ass. Deputy Griffin testified that he saw Mr. Weinstock's hands on Judge Murphy's garments and Judge Murphy's hands on Mr. Weinstock's jacket. Deputy Griffin did not recall seeing or hearing either man punch the other. Deputy Griffin further testified that he immediately stepped into the hallway and put his hands between the men to separate them. They all shifted and hit the back wall, causing a thumping sound. Deputy Griffin opined that there was no opportunity from the time he moved towards the door to the time he went through it for either man to hit the other without Deputy Griffin knowing it.

Deputy Cheryl Martinez, who was assigned to an adjacent courtroom, exited her courtroom immediately after she heard shouting and a bang. She recalled seeing Judge Murphy and Mr. Weinstock screaming at each other with two hands each on the other's collar. Deputy Martinez observed Deputy Griffin separating the men. She did not see any punch or recall seeing an arm raised in anticipation of a strike. She recalled that Mr. Weinstock claimed he was punched two times in the face and wanted Judge Murphy arrested. Deputy Martinez observed no injuries or sign that Mr. Weinstock had been punched.

Following the incident, Judge Murphy contacted psychologist Dr. Ronsisvalle for counseling. Dr. Ronsisvalle testified that he met with Judge Murphy weekly or biweekly for cognitive behavioral therapy related to anger management beginning June 6, 2014. Dr. Ronsisvalle found that throughout their therapy sessions Judge Murphy appeared positive and humble, accepted responsibility and accountability for his actions, and labeled his misconduct as inappropriate. Dr. Ronsisvalle testified that Judge Murphy was initially confused about the incident and could not believe what he had done. Once he completed the course with Dr. Ronsisvalle, Judge Murphy requested additional sessions to try to better understand the emotions underneath his anger.

Dr. Ronsisvalle described a "perfect storm" occurring within Judge Murphy emotionally during incident: Judge Murphy was fatigued, his father had recently passed, and a defendant had recently been killed outside the courthouse. Dr. Ronsisvalle also stated that during the incident Judge Murphy was in fight or flight mode: his frontal lobe was shut down, adrenaline and cortisol were pulsing, and his amygdala was activated, interfering with his judgment. Referring to the phrase "fog of battle," Dr. Ronsisvalle explained that "many soldiers after the trauma do what? They go back to their duty post. That's what you do. You put your nose to the grindstone, and you—you do what you're called to do."

Dr. Ronsisvalle was confident that the incident was atypical for Judge Murphy. Dr. Ronsisvalle opined, in his best clinical judgment, that Judge Murphy could safely return to work and that he was not at risk to repeat this behavior because he showed a significant ability to understand his emotion, developed skills to cope with anger, and recognized that a perfect storm of emotions compromised his ability to function in that moment. Dr. Ronsisvalle concluded that Judge Murphy developed more control of his anger and was confident in his coping skills to handle similar situations in the future.

Dr. Scott Fairchild conducted a Comprehensive Psychological Evaluation and six therapy sessions with Judge Murphy in June 2014. Dr. Fairchild did not testify before the Hearing Panel but offered a report dated June 23, 2014. Dr. Fairchild found in his report that "the comprehensive psychological assessment reveals no evidence of a diagnosable Posttraumatic Stress Disorder."

Finally, the parties stipulated to the testimony that would be elicited if five more witnesses were called before the Hearing Panel, each of whom was expected to testify about Judge Murphy's good character and Mr. Weinstock's reputation as difficult and unprofessional. Additionally, there were 45 letters of support submitted to the JQC on Judge Murphy's behalf. Following the incident, Judge Murphy wrote apology letters to members of the legal community and residents of

Brevard County.[1]  In his letter to the Public Defender of Brevard County, Judge

Murphy specifically apologized to Mr. Weinstock.

In its May 19, 2015, written order, the Hearing Panel unanimously found

Judge Murphy guilty of violating Canons 1,[2] 2A,[3] 3A,[4] 3B(3),[5] 3B(4),[6] 3B(7),[7]

---

1.  The apology letter to the residents of Brevard County can be viewed at http://media.cmgdigital.com/shared/news/documents/2014/06/30/Brevard_residents_letter.pdf.

2.  "An independent and honorable judiciary is indispensable to justice in our society.  A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary may be preserved. . . ."

3.  "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

4.  "The judicial duties of a judge take precedence over all the judge's other activities. . . ."

5.  "A judge shall require order and decorum in proceedings before the judge."

6.  "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control."

7.  "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.  A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ."

3B(8),[8] and 5G[9] of the Code of Judicial Conduct, and Rule of Professional Conduct 4-1.1.[10] The Hearing Panel found that there was no clear and convincing evidence that Judge Murphy struck Mr. Weinstock and could not determine which of them initiated physical contact. The Hearing Panel unanimously recommended that Judge Murphy be disciplined as follows: a public reprimand, a 120-day suspension, a $50,000 fine, mental health therapy, and Judicial Education Courses in the Florida Judicial College New Judges Program.

In response to this Court's Order to Show Cause why he should not be removed, Judge Murphy submitted a response including a Department of Veterans Affairs (VA) finding of 30% disability based on Post Traumatic Stress Disorder (PTSD) resulting from combat deployment in Afghanistan. The VA found that Judge Murphy's PTSD manifests in "disturbances of motivation and mood, chronic sleep impairment, anxiety, occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress." Although this finding was not in evidence before the JQC Hearing or Investigative Panels, the JQC noted

---

8. "A judge shall dispose of all judicial matters promptly, efficiently, and fairly."

9. "A judge shall not practice law. . . ."

10. This Rule provides that a lawyer shall provide competent representation to a client.

in its Reply that periods of significant stress are a common feature of trial judge duties and that this new diagnosis cuts against Judge Murphy's present fitness to serve.

## ANALYSIS

First, we address the JQC's findings and determination that Judge Murphy violated Canons 1, 2A, 3A, 3B(3), 3B(4), 3B(7), 3B(8), and 5G of the Code of Judicial Conduct and Rule of Professional Conduct 4-1.1 as alleged. We then analyze the JQC's recommendation and appropriate discipline.

### I. Findings and Determination of Guilt

This Court upholds JQC findings on alleged misconduct where supported by clear and convincing evidence. Sloop, 946 So. 2d at 1054. This standard of proof has been described as "more than a 'preponderance of the evidence,' but the proof need not be 'beyond and to the exclusion of a reasonable doubt.' " In re Kinsey, 842 So. 2d 77, 85 (Fla. 2003) (quoting In re Davey, 645 So. 2d 398, 404 (Fla. 1994)). Where the JQC's findings are undisputed and a judge admits misconduct, we generally conclude that the findings are supported by clear and convincing evidence. Id.; see also In re Diaz, 908 So. 2d 334, 337 (Fla. 2005); In re Andrews, 875 So. 2d 441, 442 (Fla. 2004). There is no dispute that Judge Murphy threatened violence, had a physical confrontation with Mr. Weinstock, and subsequently resumed his docket with defendants whose attorneys were not present.

Judge Murphy does not contend that the Hearing Panel erred in finding him guilty of violating the Judicial Canons and Rule of Professional Conduct. Therefore, we find the JQC's findings and its conclusion that Judge Murphy violated Canons 1, 2A, 3A, 3B(3), 3B(4), 3B(7), 3B(8), and 5G of the Code of Judicial Conduct, and Rule of Professional Conduct 4-1.1, supported by clear and convincing evidence. Accordingly, we approve the JQC's findings and conclusion.

## II. Recommended and Appropriate Discipline

"While this Court gives the findings and recommendations of the JQC great weight, 'the ultimate power and responsibility in making a determination rests with this Court.' " Kinsey, 842 So. 2d at 85 (footnote omitted) (quoting In re Davey, 645 So. 2d at 404). Under the Florida Constitution,

> The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission and it may order that the justice or judge be subjected to appropriate discipline, or be removed from office with termination of compensation for willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office, or be involuntarily retired for any permanent disability that seriously interferes with the performance of judicial duties.

Art. V, § 12(c)(1), Fla. Const. "[D]iscipline is defined as any or all of the following: reprimand, fine, suspension with or without pay, or lawyer discipline." Art. V, § 12(a)(1), Fla. Const. Additionally, "[t]he supreme court may award costs to the prevailing party." Art. V, § 12(c)(2), Fla. Const.

The object of these proceedings is not to inflict punishment, but to determine a judge's fitness to serve. In re McMillan, 797 So. 2d 560, 571 (Fla. 2001). When considering fitness to serve, this Court must hold judges "to higher ethical standards than lawyers 'by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system.' " In re Hawkins, 151 So. 3d 1200, 1212 (Fla. 2014) (citing McMillan, 797 So. 2d at 571). This high standard of ethical and professional conduct is necessary because "[t]he judicial system can only function if the public is able to place its trust in judicial officers." In re Ford-Kaus, 730 So. 2d 269, 277 (Fla. 1999). Removal is proper when clear and convincing evidence is presented that the judge has engaged in "conduct . . . demonstrating a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const.; see also In re Albritton, 940 So. 2d 1083, 1088 (Fla. 2006). "Malafides, scienter or moral turpitude on the part of a justice or judge" is not necessary for removal from office. Art. V, § 12(c)(1), Fla. Const.

### A. Present Fitness to Hold Office

We examine judicial misconduct for present fitness to hold office "from two perspectives: its effect on the public's trust and confidence in the judiciary as reflected in its impact on the judge's standing in the community, and the degree to which past misconduct points to future misconduct fundamentally inconsistent with the responsibilities of judicial office." Sloop, 946 So. 2d at 1055. To

preserve the integrity of the judiciary, a judge must observe a high standard of personal conduct, "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and be "patient, dignified and courteous" to every individual with whom the judge interacts professionally. Fla. Code of Jud. Cond. Canons 1, 3. We have repeatedly held that "[r]emoval is an appropriate discipline where the actions of the judge simply 'should erode confidence in the judiciary,' even where it does not appear that the public has lost confidence, and even where the Hearing Panel has recommended a lesser sanction than removal." Hawkins, 151 So. 3d at 1215 (quoting Sloop, 946 So. 2d at 1055 (emphasis in original)). See also In re Henson, 913 So. 2d at 588 (finding removal appropriate because "the respect of the public [is] essential to [the judiciary's] mission as the third branch of government."); In re LaMotte, 341 So. 2d 513, 518 (Fla. 1977) (finding removal proper even where misconduct does not appear to have shaken public faith in the judiciary). Even where a judge has an outstanding record, removal is the appropriate sanction for a judge whose misconduct is fundamentally inconsistent with the responsibilities of judicial office or strikes at the heart of judicial integrity. See, e.g., In re Graziano, 696 So. 2d 744, 749 (Fla. 1997); In re Johnson, 692 So. 2d 168, 172 (Fla. 1997) ("We cannot dispute Judge Johnson's otherwise unblemished judicial record."); In re Garrett, 613 So. 2d 463,

464 (Fla. 1993) (removing Judge Garrett based on one incident of petit theft despite an "unblemished career of public service").

Our inquiry into judicial misconduct must also consider its future implications on the offending judge's ability to serve. Our determinations of appropriate discipline are based in part on the likelihood of that misconduct reoccurring. Compare, e.g., In re Crowell, 379 So. 2d 107, 110 (Fla. 1979) (removing Judge Crowell for unfitness "substantially due to his tendency to lose his temper") and Sloop, 946 So. 2d at 1059 (removing Judge Sloop because "we [were] unconvinced that [he could] both effectively manage his temper and remain an effective jurist") with In re Wood, 720 So. 2d 506, 509 (Fla. 1998) (finding public reprimand appropriate given Judge Wood's candor and commitment to ongoing treatment for anger and stress management). This Court has found removal appropriate even where a judge seeks treatment for a medical condition related to his or her severe misconduct. See, e.g, Sloop, 946 So. 2d at 1056 (finding removal appropriate for arresting traffic defendants who were in the wrong courtroom as a result of being misdirected, where the judge blamed his conduct on his Attention Deficit Hyperactivity Disorder); Garrett, 613 So. 2d at 464 (finding removal appropriate for a one-time theft of electronics where the judge suffered from depression). Furthermore, a pattern of misconduct is not necessary for removal. See Sloop, 946 So. 2d at 1056; Garrett, 613 So. 2d at 464.

Focusing first on the effects on the public's trust in the judiciary, we must conclude that Judge Murphy is not presently fit to serve. Judge Murphy used profanity in an open courtroom and threatened violence against an attorney appearing before him. This is the sort of egregious conduct that erodes the public's confidence. It is without question that except for the June 2, 2014, incident, Judge Murphy has been a good judge. Notwithstanding his prior judicial performance, Judge Murphy's total lack of self-control became a national spectacle—an embarrassment not only to the judge himself but also to Florida's judicial system. Given the clear erosion of public confidence in the judiciary caused by his misconduct, removal is an appropriate sanction.

As to the likelihood of future misconduct, it is unclear whether Judge Murphy is likely to have another similar outburst. Although he immediately sought treatment and an underlying cause for his misconduct, this Court has found removal appropriate even where a judge takes steps to address mental health. See Sloop, 946 So. 2d at 1056; Garrett, 613 So. 2d at 464. We must also take note that Judge Murphy ultimately discovered an underlying cause of his misconduct: PTSD.

Although Judge Murphy's doctors indicated before the Hearing Panel that his anger and stress were being managed through treatment, these assurances conflict with the VA finding that Judge Murphy is 30% disabled based on PTSD

stemming from his combat deployment in Afghanistan. Dr. Ronsisvalle made no mention of PTSD in his testimony before the Hearing Panel, and Dr. Fairchild's report explicitly found no evidence of PTSD. In contrast, the VA found "[o]ccupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress." As the JQC indicated, a trial judge's duties frequently include periods of significant stress. The severity of Judge Murphy's behavior and the VA finding leave open the possibility of future misconduct. Based on the clear erosion of public faith in our court system caused by Judge Murphy's misconduct and the unmistakable possibility that he could have a similar outburst in the future, we must find that Judge Murphy is presently unfit to serve.

## B.  JQC Recommendation

In evaluating judicial misconduct, we generally place great weight on the recommendation of the Hearing Panel. However, this Court will not approve a recommendation for discipline short of removal for particularly egregious misconduct rendering a judge unfit for office. See, e.g., Sloop, 946 So. 2d at 1056; In re Renke, 933 So. 2d 482, 493 (Fla. 2006). Ultimately, the decision of whether to order removal rests with this Court. Kinsey, 842 So. 2d at 85.

In this case, the Hearing Panel's recommended discipline stops short of removal. However, the JQC, in its Reply to this Court's order to show cause,

- 21 -

argued that Judge Murphy's VA disability did not support his present fitness and described his misconduct as having "single-handedly caused the Florida judicial system to become a national embarrassment." Judge Murphy's "intemperate courtroom behavior not only damaged public confidence in him as a judicial officer but struck 'at the very roots of an effective judiciary, for those who are served by the courts will not have confidence in and respect for the courts' judgments if judges engage in this egregious conduct.' " In re Shea, 110 So. 3d 414, 418 (Fla. 2013) (quoting In re Schapiro, 845 So. 2d 170, 174 (Fla. 2003)). Given the erosion of public confidence caused by Judge Murphy's misconduct, we reject the JQC's recommendation of discipline in this case.

## C. Appropriate Discipline

On June 2, 2014, Judge Murphy threatened an assistant public defender with violence in open court, challenged him to a physical fight, engaged in the threatened struggle in which the two men had to be physically separated by a deputy, and reassumed the bench to handle cases where the defendants were without the presence of their attorney. Because of Judge Murphy's appalling behavior, we conclude that there is clear and convincing evidence that Judge Murphy engaged in "conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const. Judge Murphy's conduct is fundamentally inconsistent with the responsibilities of

judicial office and necessitates his removal. "[T]hrough his own actions culminating in the misconduct in this case, Judge [Murphy] has lost the public's confidence in his ability to perform his judicial duties in a fair, evenhanded, and even-tempered manner." Sloop, 946 So. 2d at 1059. Based on the foregoing, we conclude that appropriate discipline in this case demands that Judge Murphy be removed from office.

## CONCLUSION

For the reasons set forth herein, we hereby remove Brevard County Judge John C. Murphy from that office.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, and POLSTON, JJ., concur.
PERRY, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Original Proceeding – Judicial Qualifications Commission

Judge Kerry I. Evander, Chair, Michael Louis Schneider, General Counsel and Executive Director, Tallahassee, Florida; Fred Wallace Pope, Jr. and Margaret Knaust Kramer, Special Counsel, Johnson, Pope, Bokor, Ruppel & Burns, LLP, Clearwater, Florida,

for Florida Judicial Qualifications Commission, Petitioner

Larry Gibbs Turner, Peggy-Anne O'Connor, Ronald Kozlowski, and Scott T. Schmidt of Turner O'Connor Kozlowski, P.L., Gainesville, Florida,

for Judge John C. Murphy, Respondent