PARIENTE, J.,
concurring in result.
I agree with the majority that “Judge Decker’s misconduct unquestionably warrants the imposition of a serious sanction.” Majority op. at 307. I also agree with the increase of sanctions from the JQC’s recommended 90-day suspension without pay to a six-month suspension without pay. The increase in sanctions is appropriate given the seriousness of the multiple charges against Judge Decker, which would have warranted a rehabilitative suspension.[9] As the JQC found, the “cumulative effect of these misdeeds coupled with the fact that Judge Decker had been reprimanded by [T]he Florida Bar in the past, evinces a lack of ability to identify situations that lead to the appearance of impropriety.”
Although I agree with the sanctions the majority imposes, as I explain in further detail below, I cannot agree with the majority that consolidated Charge 8 found by the JQC, relating to prohibited communication with a represented party, “is not supported by the evidence.” Majority op. at 306. Accordingly, I concur in result because I disagree with the majority’s rejection of that charge.
I would not reject the JQC’s findings regarding consolidated Charge 8, which relates to then-attorney Decker’s prohibited communication with a represented party, Job White, during “secret meetings” between then-attorney Decker’s clients, Jennifer and Matthew Ellison, and Job White. As the JQC found, then-attorney Decker’s clients were defendants in a foreclosure action brought by Compass Bank. In June 2014, then-attorney Decker “served an answer on Brent C. Siegel ... who represented Fred and Kelly Shore, Ted Burt, and Job White and his wife, Frances Grace White, and various entities in which Burt and Shore were involved.” Some of these parties who Seigel represented “were actively involved in efforts to reinstate, refinance, or even buy the Compass Bank loan, probably through a third party, in an effort to save the condominium project for which the loan was made.” Unknown to Siegel’s clients, however, is that in October 2014 “the Ellisons began their own discussions and negotiations with *310 Compass Bank to buy the loan for their own benefit,” thereby becoming competitors with Siegel’s clients seeking to purchase the Compass Bank loan.
The JQC found that, in attempting to purchase the Compass Bank loan, then-attorney Decker and Jennifer Ellison, also a lawyer, “met in secret” with Job White. The purpose of the meeting was “to discuss a possible settlement of the Compass Bank case as to the Whites only. Pursuant to this settlement the Whites would provide funds that the Ellisons would use to help them buy the Compass loan, and, if the Ellisons were successful in doing so, the Ellisons as the new owners of the Compass loan, would dismiss all claims against the Whites.” When then-attorney Decker met with Job White, he knew that the Whites already had counsel, Siegel, who had not sought or been given leave to withdraw from representing the Whites. Nonetheless, one day after the initial “secret meeting” between the Whites, the El-lisons, and then-attorney Decker, “a deal was reached, was reduced to writing and was executed.”
Judge Decker’s defense to his actions, which the majority accepts, is that White told then-attorney Decker he was no longer represented by counsel. But, then-attorney Decker knew White had been represented by Siegel. Indeed, then-attorney Decker had “served an answer on” Siegel in the ongoing litigation just four months prior to secretly meeting with White. After then-attorney Decker was informed by Job White that he was not represented in forming the secret agreement, then-attorney Decker made no attempt to verify whether the Whites had indeed discharged Siegel or whether Siegel had filed a motion to withdraw with the circuit court. Siegel did not learn of the secret agreement that his clients had entered into with then-attorney Decker’s client for more than a month after it was executed. In fact, as the JQC noted, the settlement agreement between the Ellisons and the Whites contained, in “an apparent effort to protect the secrecy of the settlement,” a confidentiality provision which stated “that the parties shall not disclose the terms of the agreement except to their respective legal counsel.” This provision makes little sense if Job White was no longer represented by Siegel. Indeed, Siegel testified at the JQC hearing that he was still representing the Whites when then-attorney Decker met with Job White, did not give any consent to then-attorney Decker to meet with his client, and that he was “stunned” when he learned of the “secret meeting.”
The majority excuses this violation by stating that a “party who like White has decided that he no longer desires to be represented by counsel should not be chained to counsel for purposes of Rule of Professional Conduct 4-4.2(a) until counsel withdraws under Florida Rule of Judicial Administration 2.505(f)(1).” Majority op. at 306. However, as the JQC’s finding reflects, after a party claims he or she has discharged counsel of record, there are important reasons to verify with the counsel of record that counsel has, in fact, been discharged or has withdrawn. In fact, in this case, there appears to be a factual dispute as to whether White had actually discharged Siegel from representation.
We have emphasized the utmost importance of this verification in criminal cases. See The Florida Bar v. Feinberg, 760 So.2d 933, 939-40 (Fla. 2000) (holding that a prosecutor’s actions in meeting with a defendant who had counsel after the defendant told the prosecutor he had discharged his counsel “cast a shadow over the integrity of our adversarial system,” and explaining “that attorneys must be extremely cautious in determining whether to speak with an individual who appears to be rep *311 resented by counsel”). While the stakes are different in a civil matter, the importance of confirming with opposing counsel that counsel has actually withdrawn or has been discharged before proceeding to meet with the formerly represented party ensures that a shadow is not cast over the integrity of our adversarial system.
According to Florida Rule of Professional Conduct 4-4.2(a), “a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter.” The comment to Rule 4-4.2 further provides, “This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. ... Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious.”
In this case, Judge Decker alleges that he had “actual knowledge” that White was not represented because White personally advised him of that fact. Yet, this was not the full extent of then-attorney Decker’s knowledge about White’s representation. Then-attorney Decker also knew that White had been previously represented in the litigation. Furthermore, as the JQC found, the settlement agreement between the parties provided that the terms of the agreement could only be discussed with legal counsel. White would have no need for a provision allowing him to inform counsel of the settlement agreement if he did not already have counsel. Therefore, especially in the context of these “secret meetings,” which could have undermined Siegel’s other clients who also sought to purchase the Compass Bank loan, Judge Decker should not be shielded from professional responsibility by “closing [his] eyes to the obvious.” Judge Decker was not cautious in this regard, and his good intentions pertaining to his clients do not overcome the harm that is, or can be, occasioned by meeting with someone who is represented by counsel without counsel’s permission during ongoing litigation.
Lastly, Judge Decker’s ethical missteps as an attorney, in my view, are compounded by the false and otherwise unethical statements he made on the campaign trail. First, he stated “at a televised debate that he had never been accused of a conflict of interest.” Majority op. at 298. This was false, as “less than four months earlier, a formal complaint was filed with The Florida Bar by Daniel Dukes, a former client [of then-attorney Decker’s], alleging conflict of interest.” Id. at 294. Then-attorney Decker knew that he had been previously accused of a conflict of interest because he had “responded to that complaint with a twelve-page letter only two and one half months before the debate.” Id. While Judge Decker admitted his guilt as to this misconduct, he has, as the JQC noted in its findings, maintained his “steadfast position that he has done nothing wrong.”
Additionally, while campaigning for his judicial seat, then-attorney Decker affiliated himself with the Republican Party. At a judicial forum sponsored by the Lafayette County Republican Executive Committee, then-attorney Decker stated to the audience that he is a registered Republican and that his former affiliation with the Democratic Party “was an error.” Id. at 294. I agree with the majority that this conduct “was also proven and violated Canon 7C(3) of the Code of Judicial Conduct,” as well Rule 4-8.2(b) and section 105.071(3), Florida Statutes. Majority op. at 301.
This Court has “often pointed out that judges should be held to higher ethical standards than lawyers by virtue of their position in the judiciary and the impact of *312 their conduct on public confidence in an impartial justice system.” In re McMillan, 797 So.2d 560, 571 (Fla. 2001). Boldly stating that one is a member of a political party while campaigning for a nonpartisan judicial office and misrepresenting to voters one’s record on ethics is discordant with the “high standard of ethical and professional conduct” required of judges. In re Murphy, 181 So.3d 1169, 1177 (Fla. 2015).
Unlike past instances when this Court has removed a judge from the bench, however, Judge Decker’s conduct is not so “fundamentally inconsistent with the responsibilities of judicial office” as to erode confidence in the judiciary and thereby necessitate removal. Id. at 1179. For all these reasons, I concur in the strong message this Court sends by imposing a six-month suspension without pay and a public reprimand. As the JQC remarked, “it is imperative that Judge Decker spend a period of time reflecting upon the far-reaching consequences of his actions.” Unfortunately, this suspension will negatively affect the other judges of the Third Judicial Circuit, who will have to absorb Judge Decker’s workload. However, the purpose of the JQC proceedings is to “gauge a judge’s fitness to serve,” majority op. at 308, and by all accounts, despite his professional misconduct as an attorney, Judge Decker has ably served the citizens of the Third Judicial Circuit since assuming the bench. The sanction this Court imposes ensures that the Third Judicial Circuit will not be deprived of Judge Decker’s judicial service on a permanent basis.

. With a rehabilitative suspension, when an attorney is suspended for a period of time of more than ninety days but less than three years, the attorney is required to petition The Florida Bar for readmission to practice law and “shall require proof of rehabilitation.” Std. 2.3, Fla. Std. for Imposing Lawyer Sanctions, The Florida Bar (last updated May 2015). If he had been under a rehabilitative suspension, Judge Decker would have been ineligible to become a judge unless he had been readmitted to the practice of law. See In re Advisory Op. to Governor re Comm'n of Elected Judge, 17 So.3d 265, 267 (Fla. 2009) (explaining that "a lawyer who is suspended from the practice of law fails to satisfy the constitutional eligibility requirements for a circuit court judgeship”).