# Supreme Court of Florida

_____

No. SC17-362

_____

**INQUIRY CONCERNING A JUDGE NO. 16-534
RE: DANA MARIE SANTINO.**

October 19, 2018

PER CURIAM.

On July 2, 2018, this Court issued an order removing Dana Marie Santino from the office of county judge of Palm Beach County, Florida. The order provided that an opinion would follow explaining the reasons for removal.[1]

## CHARGES, FINDINGS, AND RECOMMENDATION

On March 6, 2017, the Investigative Panel of the JQC filed a notice of formal charges against then-Judge Dana Marie Santino finding probable cause existed for formal proceedings to be brought against her based upon violations of canons 7A(3)(a), 7A(3)(b), 7A(3)(c), 7A(3)(e)(i), and 7A(3)(e)(ii) of the Florida

---

1. We have jurisdiction. *See* art. V, § 12(c), Fla. Const.

Code of Judicial Conduct, and rules 4-8.2(a) and 4-8.2(b) of the Rules Regulating

the Florida Bar.  The specific allegations were as follows:

1.  During your 2016 campaign for Palm Beach County Judge, you paid over $143,000 for the campaign consulting services [of] Richard Giorgio and Francine Nelson, of Patriot Games, Inc.

2.  In October of 2016, your campaign published an e[-]mail addressed to potential voters, which lists your experience as a probation officer, a victim services advocate for victims of rape, homicide and domestic violence.  Your advertisement then states that your opponent's legal practice is "*limited to criminal defense—representing murderers, rapists, child molesters and other criminals*."

a.  Your campaign e[-]mail advertisement prompted the Palm Beach Post to run an article about your statements titled "*PBC race gets ugly—some say—in Donald Trump-like way*".  Rather than retracting or apologizing for your campaigns [sic] disparaging remarks, you told the Palm Beach Post newspaper that, "*I completely respect, and I'm proud of our justice system, and while every person is entitled to a defense, Mr. Lerman is not a public defender, and chooses to represent individuals who commit heinous crimes*."

b.  Significantly, your statement that Mr. Lerman is not a public defender, but *chooses* to represent individuals who commit heinous crimes, undeservedly impugns the integrity of the entire judicial system by demeaning the work of private attorneys who represent accused persons. In light of your own experience working in a public defender's office, you attempt to draw a distinction between public defenders and private defense attorneys and the quality of their character.

3.  Ms. Nelson, of Patriot Games consultants, also registered a political organization named 'Taxpayers for Public Integrity.'  This political organization promoted your candidacy by attacking your opponent, Gregg Lerman.

a.  During the 2016 campaign, 'Taxpayers for Public Integrity' produced a Facebook webpage, titled 'The Truth About Gregg Lerman.'  The headline banner of this page proclaimed that, "***Attorney Gregg Lerman has made a lot of money trying to free Palm Beach County's worst criminals.  Now he's running for judge!***"  Below that, a photograph of Mr. Lerman was surrounded by the words, "**CHILD PORNOGRAPHY**," "**DRUG TRAFFICKING**," "**MURDER**[,]" "*Identity Theft*," "*RAPE*," "**Sexual Assault**," "Internet Solicitation of Minors," and "**PEDOPHILES**." [emphasis used in original].

b.  This webpage also highlights several cases where Mr. Lerman represented persons accused of high-profile crimes.  In describing these crimes, the website states:

> "Instead of representing victims of crime, Gregg Lerman chose to represent convicted serial killer Ronald Knight who targeted gay men and brutally murdered them.  Now, he's running for Judge!"

> "Instead of representing the victims of crime, Gregg Lerman chose to represent one of the convicted accomplices in the 'Turnpike Murder' of a family of four, including two children ages 3 and 4.  Now, he's running for Judge!"

> "Instead of representing the victims of crime, Gregg Lerman chose to represent one of the four convicted codefendants in the 'Three Amigos' robbery-murder.  Now, he's running for Judge!"

> "Instead of representing the victims of crime, Gregg Lerman chose to represent one of the convicted 'Thanksgiving Day' murderers.  Now, he's running for Judge!"

c.  In addition to the wholly inappropriate connotation and tenor of these statements, the substance of the statements is also false.  In three of the cases, Mr. Lerman was court-appointed to represent the accused person.  The website is no longer viewable.

4.  In response to your conduct, your opponent filed a complaint with the Palm Beach County Bar Association's Judicial Campaign Practices Commission ("JCPC"), a group that renders advisory opinions about perceived misconduct in Palm Beach judicial campaigns.

a.  In responding to the JCPC complaint, you steadfastly defended your conduct by stating that[:] (1) your e[-]mail truthfully states Mr. Lerman's experience, (2) that the Facebook post was made by an ECO [electioneering communications organization] independent of you, and is truthful, including the statement that Mr. Lerman has made a lot of money representing criminal defendants, and (3) that the statements in the e-mail, in the Facebook post, and to the Palm Beach Post merely are efforts to highlight the differences between you and Mr. Lerman. Specifically, your response to the JCPC stated, "*I have been an advocate for the victims of rape, homicide and domestic violence while Mr. Lerman has chosen to represent the criminal defendants convicted of those crimes.*"

b.  On November 2, 2016, in [the] final days before the November election, the JCPC, by a vote of 11-0, found your campaigns' [sic] statements and conduct violated the Code of Judicial Conduct.  The JCPC wrote that your e-mail advertisement was "inflammatory," and "rife with innuendo that Mr. Lerman would favor even the worst of the worst from the bench, whereas by implication, Ms. Santino would not."  This, the JCPC found, ". . . invites the voter to choose based on a candidate's supposed predisposition—or in Ms. Santino's case an implied pledge—that is inconsistent with the impartial performance of judicial duties."

- 4 -

c. The JCPC also noted that your e-mail and other campaign messages ". . . omits important context: the presumption of innocence, the constitutional right to counsel that persons accused of crimes are afforded, and the system of court-appointed counsel that supports that right." The advisory Committee also found that your e[-]mail "implies that representing such persons is dishonorable and antithetical to the public good, when, in fact, the representation of person[s] accused of crimes— even heinous crimes—is an essential component of our criminal justice system."

d. In responding to the JCPC's unanimous decision, you told the Palm Beach Post, in a November 2 article titled *PBC judge hopeful Dana Santino violated judicial canons advisory panel finds*, that the JCPC's decision was, "just their opinion," and that your statements were, "an honest comparison." Your campaign manager also referred to Mr. Lerman as "desperate," for filing the complaint about your conduct.

e. At the time the JCPC released its decision, you also commented to Mr. Lerman that your campaigns' [sic] statements were "nobody's business," and that you have a right to free speech. Prior to this, you also informed Mr. Lerman that it was your belief that you were not responsible for whatever others, including your campaign consultants, said or did on your behalf. You also made a similar claim to an audience at a campaign forum shortly after your October e-mail message became a topic of public discussion. This is contrary [to] the requirements of Canon 7.

5. In your response to the Commission's Notice of Investigation, and again in your sworn testimony before the Investigative Panel, you appeared remorseful and apologetic. You accepted "full responsibility" for your campaigns [sic] conduct, and you recognized that the language used was "not appropriate and was inconsistent with the dictates of Canon 7." You called the statements about your

opponent "disparaging," and acknowledged that the statements could lead a reasonable person to question your impartiality.

6. When your appearance before the Investigative Panel is contrasted with your prior repeated, and steadfast defense of your misconduct, it is difficult to escape the conclusion that you and your campaign consultants employed a 'win-at-all-costs,' and pay the fine later strategy. This conduct is antithetical to the conduct expected of judicial candidates. Further, your inability to understand and comply with, or willingness to overlook the requirements of the Code of Judicial Conduct represent [sic] a clear and present unfitness for office.

(Fifth alteration in original.)

A final hearing was held before the JQC Hearing Panel, and on

September 28, 2017, the panel issued its findings and conclusions.

Judge Santino admits violating Canon 7A(3)(a) and 7A(3)(b), and Rule 4-8.2(b) of the Rules [Regulating] the Florida Bar. Her admissions are supported by clear and convincing evidence. *See In re Kinsey*, 842 So. 2d 77, 89-90 (Fla. 2003). This Panel concludes that Judge Santino also violated Judicial Canon 7A(3)(c), (e)(i), and (e)(ii) and Rule 4-8.2(a), Rules of Professional Conduct, for the same reasons reached by the JCPC. Candidate Santino did not merely compare her background, qualifications, character and integrity with that of her opponent. She imputed guilt to those that were merely accused. She also expressly stated and implied that Lerman was not impartial, was predisposed to favor criminals, while she was predisposed to victims, and courted votes based on each candidate's supposed predisposition. Her entire campaign was inflammatory and rife with innuendo. She repeatedly implied that representing persons charged with crimes was, by its very nature, dishonorable and antithetical to the public good. *See generally Little Bridge Marina, Inc. v. Jones Boatyard, Inc.*, 673 So. 2d 77, 78-79 (Fla. 3d DCA 1996) (impeachment of a critical witness by resort to his past career as a criminal defense attorney warranted reversal for inflaming the passion of a jury). Santino expressly stated or implied that Lerman could not be trusted "for laboring in an occupation that serves to breathe life and

- 6 -

meaning into the Sixth Amendment." *Id.* [at 79.] Her published comments, as well as the Facebook page, falsely communicated to the reader that Lerman was unfit for judicial office because of the type of law he practiced, and the type of clients he represented.

Candidate Santino did not prohibit or discourage campaign personnel from doing what she was prohibited from doing, even though they were subject to her control. By her own account, Santino allowed such personnel to operate unfettered or unrestrained.

Candidate Santino, individually, and through her campaign manager, made statements about Mr. Lerman's integrity, with reckless disregard of the truth. She claimed evident partiality and bias on Lerman's part, based solely on his employment as a criminal defense attorney. The Taxpayers for Public Integrity Facebook website, established by Santino's campaign manager, encapsulated Lerman's photograph, with bold prominent displays of crimes, in an attempt to portray Lerman as a criminal or, [sic] one who associates with criminals. It was specifically designed to evoke base human emotions that our legal system, this profession, and our State and Federal Constitutions all seek to overcome. It was a calculated, tactical decision to ensure that Santino won her election for a judgeship. While she disclaims her role in this process, Judge Santino was reckless in delegating decision-making to her campaign manager, without supervision, and permitting him to speak and act on her behalf continuously even after the filing of the JCPC complaint (October 25, 2016), when she believed she had been misled.

The Hearing Panel concluded that removal was the only appropriate discipline in this case.

## FACTS AND BACKGROUND

This disciplinary matter against Santino arose out of both false and misleading statements that Santino made about her opponent, Gregg Lerman, in e-mail advertisements and on social media during her 2016 election campaign for the office of county judge for Palm Beach County. In April 2016, the Palm Beach

County judge seat became available after the sitting judge resigned. We determined that the vacancy was to be filled by election rather than appointment, *Lerman v. Scott*, No. SC16-783, 2016 WL 3127708, *1 (Fla. June 3, 2016), and Santino entered the race after the original qualifying period was reopened by this Court. Attorney Gregg Lerman was one of two candidates who had qualified prior to the date that *Lerman* issued.

Santino hired Richard Giorgio of Patriot Games, Inc., as her campaign manager. She testified that she reviewed the judicial canons, attested under oath that she understood all requirements, and received a pamphlet on understanding Canon 7. Nonetheless, Santino admitted that she failed to review the case law attached to the pamphlet pertaining to her ethical obligations in her judicial campaign. Furthermore, Santino did not attend the local judicial campaign conduct forum.

The third candidate seeking the judicial seat was subsequently eliminated during the primary election, leaving a runoff between Santino and Lerman. Approximately one month later, on September 23, 2016, a Facebook page titled "The Truth About Gregg Lerman" was created by Taxpayers for Public Integrity, an electioneering communications organization (ECO) formed and administered by Patriot Games, Inc. The header of the Facebook page stated "Attorney Gregg Lerman has made a lot of money trying to free Palm Beach County's worst

criminals. Now he's running for judge!" Additionally, the page contained posts that outlined Lerman's representation in four high-profile homicide cases, stating that he "chose" to represent the defendants. Lerman testified before the Hearing Panel that he was court-appointed on three of those cases, and was privately retained on the fourth. He is also one of a limited number of attorneys in Florida who meets the qualifications to represent defendants in cases where the State is seeking the death penalty.

The Facebook page was viewable for approximately one month, from September 23, 2016, until October 21, 2016. Santino testified that she had discussed a Facebook page with Giorgio that would juxtapose the candidates' relative positions. However, Santino testified that she was not aware of the content of the page before it was posted and, upon her request after she was informed by two prominent attorneys that it was being "ill-received," the page was taken down.

On October 12, 2016, Santino's campaign sent out an e-mail that stated Lerman's legal practice was "limited to criminal defense—representing murderers, rapists, child molesters and other criminals." Santino admitted at the final hearing that this statement was inappropriate and violated the canons. She testified that Giorgio had convinced her it was not a violation because the language was true, and Lerman advertised it on his own website.

The *Palm Beach Post* published an article on October 21, 2016, entitled "Facebook New Weapon in Nasty PBC Judicial Race." Four days later, a local attorney filed a complaint about Santino with the Palm Beach County Bar Association's Judicial Campaign Practices Commission (JCPC).[2] In her response to the complaint, Santino defended her actions by indicating her statements about Lerman's experience were truthful, the Facebook page was made by an ECO independent of her campaign and was truthful, and the statements were attempts to highlight differences between herself and Lerman. On October 27, 2016, the *Palm Beach Post* published another article titled "PBC Court Race Gets Ugly—Some Say—in Donald Trump-Like Way." In the article, Santino defended her statements concerning Lerman's "choice" to represent criminal defendants by stating, "I completely respect and I'm proud of our judicial system and while every person is entitled to a defense, Mr. Lerman is not a public defender and chooses to represent individuals who commit heinous crimes." She further defended her statements by claiming that she was pointing out differences between herself and Lerman.

_____

2. The JCPC is a group of attorneys from the Palm Beach County Bar Association that attempts to moderate judicial campaigning in the Fifteenth Judicial Circuit by rendering advisory opinions about allegations of misconduct in Palm Beach County judicial campaigns. The JCPC is not a body of the JQC or The Florida Bar.

The advisory opinion issued by the JCPC less than one week before the general election unanimously concluded that Santino had violated judicial canons. The JCPC concluded that Santino knowingly mischaracterized Lerman's experience through inflammatory statements that failed to take into account the presumption of innocence to which an accused is entitled, the constitutional right to counsel, and the constitutional right of indigent defendants to court-appointed counsel. It further concluded Santino made statements that invited voters to choose a candidate based on an alleged predisposition. The same day, the *Palm Beach Post* published an article about the JCPC's findings. Santino again defended her actions, stating, "I appreciate the opinion of the commission; however, as the commission itself discloses in their letter, it is just that—their opinion."

On November 3, 2016, Lerman and Santino were present at an early voting site and exchanged words over alleged misrepresentations made to putative voters. During a deposition, Lerman recalled stating to Santino, "We'll see what the JQC and the Florida Bar have to say . . . about what you've done," to which Santino responded, "It's none of their business, the JQC's or the Florida Bar's business, anything about this." Lerman later testified that Santino also stated, "*We didn't do anything wrong. I didn't do anything wrong.*" (Emphasis added.)

Santino defeated Lerman in the general election and was sworn in as a Palm Beach County Court judge on January 3, 2017. She was subsequently asked at a social gathering whether misconduct charges could possibly lead to her removal. According to the individual who asked the question, Santino responded to the following effect: "No. I think it . . . won't rise to that. *It will be probably a fine. It's not a big deal.*" (Emphasis added.)

On March 6, 2017, the Investigative Panel of the JQC filed a notice of formal charges against Santino, alleging she made false or misleading statements about her opponent in advertisements and social media during her campaign for election to judicial office. Additionally, the charges addressed her defense of these statements in response to the complaint filed with the JCPC. In her answer to the formal charges, Santino acknowledged that her comments drawing a distinction between public defenders and private defense attorneys were inappropriate. While explaining that the Facebook page was taken down at her direction, Santino admitted the statements were inappropriate, wrong, and used language that violated the canons.

Santino testified at the final hearing that all of the conduct alleged in the formal charges occurred in the last three and a half weeks of the campaign. Regarding the Facebook page, Santino again admitted at the final hearing that the page was inappropriate and violated the canons. She explained she had not been

- 12 -

aware of the content of the Facebook page prior to it being posted and ultimately had the page taken down after hearing from prominent attorneys that it was being "ill-received." As to the e-mail sent out by Santino's campaign on October 12, 2016, she took full responsibility for the language that outlined Lerman's legal practice as "limited to criminal defense—representing murderers, rapists, child molesters and other criminals." In response to an inquiry by a Hearing Panel member as to why she waited until after the election to apologize to Lerman, Santino answered:

> Mr. Lerman, after the election was over, had made it clear that he was going to file a JQC complaint against me, so I did not know how to handle the matter of apologizing to him, and as soon as everything became official, the first thing I discussed with [my lawyer] was apologizing to [Lerman] and apologizing to the JCPC.

Moreover, Santino was asked, "So as a candidate, you never said to the citizens of this county, 'what was on that Facebook page was a violation of the rules I agreed to follow and it was deplorable and atrocious'? Did you ever say anything like that during the campaign at any time?" Santino responded that she did not.

The Hearing Panel of the JQC concluded that Santino violated canons 7A(3)(a), 7A(3)(b), 7A(3)(c), 7A(3)(e)(i), and 7A(3)(e)(ii) of the Florida Code of Judicial Conduct, and rules 4-8.2(a) and 4-8.2(b) of the Rules Regulating the Florida Bar and recommended that she be removed from office.

**ANALYSIS**

In removing Santino from judicial office, we fully agreed with the findings, conclusions, and recommendation of the JQC.

> The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission and it may order that the justice or judge be subjected to appropriate discipline, or be removed from office with termination of compensation for willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office . . . .

Art. V, § 12(c)(1), Fla. Const. "Removal is proper when clear and convincing evidence is presented that the judge has engaged in 'conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.' " *In re Hawkins*, 151 So. 3d 1200, 1216 (Fla. 2014) (quoting art. V, § 12(c)(1), Fla. Const.).

Where a judge commits misconduct in office, this Court has examined the issue of "present fitness" from two perspectives: "its effect on the public's trust and confidence in the judiciary as reflected in its impact on the judge's standing in the community, and the degree to which past misconduct points to future misconduct fundamentally inconsistent with the responsibilities of judicial office." *In re Sloop*, 946 So. 2d 1046, 1055 (Fla. 2006); *see also In re Murphy*, 181 So. 3d 1169, 1177 (Fla. 2015). However, the Court has also considered "present fitness" from a different vantage point where the misconduct at issue involves campaign

violations in the course of seeking judicial office. *See, e.g.*, *In re McMillan*, 797 So. 2d 560, 573 (Fla. 2001) ("[T]o allow someone who has committed such misconduct during a campaign to attain office to then serve the term of the judgeship obtained by such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins.").

In the present case, we first considered the effect that Santino's actions had on the public's trust in the judiciary. "Florida has a compelling interest in protecting the integrity of the judiciary and maintaining the public's confidence in an impartial judiciary . . . ." *Fla. Bar v. Williams-Yulee*, 138 So. 3d 379, 385 (Fla. 2014), *aff'd*, 135 S. Ct. 1656 (2015); *see also In re Kinsey*, 842 So. 2d 77, 87 (Fla. 2003); *In re Code of Judicial Conduct (Canons 1, 2, & 7A(1)(b))*, 603 So. 2d 494, 497 (Fla. 1992). As this Court has explained:

> "The concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record. But no one denies that it is genuine and compelling." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. at 1667. A judicial candidate who knowingly misrepresents any fact concerning the candidate or an opponent necessarily intends to mislead the public concerning the judicial election, thus undermining the public's confidence in the integrity of the judiciary. *See, e.g.*, *In re Renke*, 933 So. 2d 482, 495 (Fla. 2006). Such conduct "raises an appearance of impropriety and calls into question, in the public's mind, the judge's" integrity.

*In re Shepard*, 217 So. 3d 71, 78 (Fla. 2017) (citation omitted) (quoting *Williams-*

*Yulee*, 138 So. 3d at 385).

According to the Hearing Panel:

Santino reviewed the Judicial Canons and signed a form, under oath, attesting that she understood their requirements. She also received and said she reviewed an "Aid to Understanding Canon 7," a pamphlet given to judicial candidates which addresses campaign pitfalls and restrictions. She did not review any case law hyperlinked by the pamphlet. Nor did Santino attend the local judicial campaign conduct forum sponsored jointly by the Florida Supreme Court and the Florida Board of Governors held in West Palm Beach.

Despite the resources available to her to run a professional, ethical campaign in

accordance with Canon 7, the JQC Hearing Panel concluded:

Candidate Santino, individually, and through her campaign manager, made statements about Mr. Lerman's integrity, with reckless disregard of the truth. She claimed evident partiality and bias on Lerman's part, based solely on his employment as a criminal defense attorney. The Taxpayers for Public Integrity Facebook website, established by Santino's campaign manager, encapsulated Lerman's photograph, with bold prominent displays of crimes, in an attempt to portray Lerman as a criminal or, [sic] one who associates with criminals. It was specifically designed to evoke base human emotions that our legal system, this profession, and our State and Federal Constitutions all seek to overcome. It was a calculated, tactical decision to ensure that Santino won her election for a judgeship. While she disclaims her role in this process, Judge Santino was reckless in delegating decision-making to her campaign manager, without supervision, and permitting him to speak and act on her behalf continuously even after the filing of the JCPC complaint (October 25, 2016), when she believed she had been misled.

Moreover, the JQC concluded that these messages were not just present in one campaign advertisement or a single post on a Facebook page, but rather, were the "theme of [Santino's] entire campaign."

We agreed with the JQC that it "strain[ed] credulity to believe that [] Santino never looked at the Facebook []page she knew was going to be created, when it was available to the public, after she received telephone calls from prominent lawyers telling her it was not being 'well received,' or even, as she said, before telling her campaign consultant to take it down." As noted by the Hearing Panel, "[n]othing in Canon 7 permitted Santino to delegate to her campaign manager the responsibility for written materials created or distributed by the campaign." Santino's conduct cannot be deemed the product of "missteps" in the course of a heated campaign. Accordingly, the actions of Santino—individually and through her campaign, for which she was ultimately responsible—unquestionably eroded public confidence in the judiciary.

We next examined the degree to which Santino's past misconduct points to future misconduct. We were mindful that before the JQC and this Court, Santino accepted full responsibility for her actions. Additionally, we recognized that Santino sent apology letters to Lerman and the members of the JCPC following the election. Finally, we noted the exemplary character testimony received at the hearing.

- 17 -

However, although Santino accepted responsibility for her actions, she did not do so until the JQC complaint was filed against her. Until that occurred, Santino demonstrated a consistent refusal to accept responsibility for her actions. For example, after the JCPC issued its unanimous advisory opinion concluding she had violated the judicial canons, Santino was quoted in a news article as stating that, while she "appreciate[d] the opinion of the commission . . . it is just that— their opinion." When Santino and Lerman discussed at an early voting site what The Florida Bar and the JQC would say about her campaign comments, she responded, "It's none of their business, the JQC's or the Florida Bar's business, anything about this," and that she did nothing wrong.

This Court has previously warned judicial candidates that serious campaign violations could warrant removal. *See, e.g.*, *In re Renke*, 933 So. 2d 482, 493-96 (Fla. 2006); *McMillan*, 797 So. 2d at 572-73; *In re Alley*, 699 So. 2d 1369, 1370 (Fla. 1997). Santino correctly observed that prior election cases ordering removal based on violations of Canon 7 involved some type of additional misconduct. *See Renke*, 933 So. 2d at 494 (judge accepted illegal campaign contributions); *McMillan*, 797 So. 2d at 569-70 (judge presided over first appearance and set excessive bond in a case to which he was not assigned and in which he personally observed and reported to the police the conduct of the defendant). However, even

if we had not previously imposed the discipline of removal for violations of Canon 7 alone, nothing prohibited us from doing so here.

Santino's reliance on *In re Kinsey*, 842 So. 2d 77, to support rejection of the JQC's recommended sanction was misplaced because her misconduct was far more egregious. While Santino was correct that, similar to *Kinsey*, her campaign made wholly improper statements asserting that her opponent favored a particular group, Santino failed to acknowledge that she did not merely imply that Lerman would favor criminal defendants if elected. She also personally attacked his character, demeaned private criminal defense attorneys, and implied she would favor the State in criminal trials. Moreover, Santino, in an effort to discredit and attack her opponent, evidenced a clear bias against criminal defendants. As the Hearing Panel determined:

> Candidate Santino did not merely compare her background, qualifications, character and integrity with that of her opponent. She imputed guilt to those that were merely accused. She also expressly stated and implied that Lerman was not impartial, was predisposed to favor criminals, while she was predisposed to victims, and courted votes based on each candidate's supposed predisposition. *Her entire campaign was inflammatory and rife with innuendo. She repeatedly implied that representing persons charged with crimes was, by its very nature, dishonorable and antithetical to the public good. See generally Little Bridge Marina, Inc. v. Jones Boatyard, Inc.*, 673 So. 2d 77, 78-79 (Fla. 3d DCA 1996) (impeachment of a critical witness by resort to his past career as a criminal defense attorney warranted reversal for inflaming the passion of a jury). Santino expressly stated or implied that Lerman could not be trusted "for laboring in an occupation that serves to breathe life and meaning into the Sixth Amendment." *Id.* [at 79]. Her published comments, as well as the

> Facebook page, falsely communicated to the reader that Lerman was unfit for judicial office because of the type of law he practiced, and the type of clients he represented.

(Emphasis added.)

Santino's numerous statements during her campaign evidenced a bias against criminal defendants, toward whom she imputed guilt; against criminal defense attorneys, whom she implied had some character fault because they "choose" to represent criminal defendants; and in favor of victims, whom she boasted that she worked to protect during her legal career. Such statements are sufficient to create fear on the behalf of criminal defendants—who are entitled to a presumption of innocence under the basic tenets of our judicial system—that they would not receive a fair trial or hearing.

In removing Santino from office, we did not take this sanction lightly. However, despite the significant mitigation in this case, we agreed with the JQC's recommendation. The JQC clearly considered the mitigation presented and ultimately concluded:

> Judge Santino's post-election remarks that discipline would "probably be a fine" and was "no big deal" confirm that a fine or suspension would be inadequate, and treated as the routine cost of doing business. *See Kinsey*, 842 So. 2d at 99-10[0] (Lewis, J). A suspension without pay would also have the "unavoidable consequence" of punishing the circuit and its citizens by a vacancy in the position. *Id.* at 95-96 (Pariente, J).

We likewise agree.

- 20 -

Simply stated, Santino's conduct does not evidence a present fitness to hold judicial office. It is "difficult to allow one guilty of such egregious conduct to retain the benefits of those violations and remain in office." *Alley*, 699 So. 2d at 1370. We refuse to endorse a "win-at-all-costs-and-pay-the-fine-later" strategy, especially in light of our past warnings and stated intolerance for the kinds of campaign violations at issue here. By her own admission, had we imposed a fine as a sanction, it would confirm that Santino's violations were "not a big deal." Moreover, if this Court imposed a suspension, it would send a message to all attorneys campaigning for judicial office that they may commit egregious violations of Canon 7 during their campaigns and if they win, a suspension or a fine or both will be the only result. They will be allowed to reap the benefits of their misconduct by continuing to serve the citizens of this state. This we cannot condone. Accordingly, we continue to share the sentiments of the JQC:

> We are mindful of—and heavy-hearted about—the testimony of Judge Santino's witnesses that she is beloved by many, and a judge with a strong work ethic. However, were we to countenance her studied and continued refusal to abide by Canon 7, we would ourselves be undermining the rules governing judicial elections.

- 21 -

# CONCLUSION

For the reasons discussed above, by order dated July 2, 2018, Dana Marie Santino was removed from judicial office.

PARIENTE, QUINCE, LABARGA, and LAWSON, JJ., concur.
LEWIS, J., concurs in result only with an opinion.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LEWIS, J., concurring in result only.

Today, the majority has chosen to sanitize and soften the facts surrounding the campaign misconduct committed in this case apparently in the interest of political correctness or for some other reason. The circumstances of this case, however, are so egregious and so reprehensible that any attempt to refine them does a disservice to the bench and to our judicial system as a whole and it further diminishes the citizen's trust in the judiciary beyond the damage that Santino has already inflicted. I simply cannot endorse the sanitized rendition of the facts with the omission of the actual published material along with the analysis that the majority adopts. Nevertheless, I support the JQC's recommended sanction of removal, given the nature of the facts in this case and this Court's precedent, which has long stated our intolerance for judicial candidate misconduct such as that at issue in the present case.

- 22 -

In determining that removal was the appropriate discipline, the Hearing

Panel concluded as follows:

> First, we reject the notion that candidate Santino merely made "mistakes" or "missteps" in the course of a heated campaign. Her conduct "was not simply the product of an isolated instance of indiscretion, a momentary lapse of judgment; or the exposure of human frailty from which we all suffer from time to time. The conduct here was repeated, intentional, direct action with a designed purpose which cast aspersions and doubt onto the heart of the judicial system and the elected judicial office sought by [the] Judge . . ." *In re Kinsey*, [842 So. 2d 77, 97 (Fla. 2003)] (Lewis, J, concurring in part and dissenting in part). Santino knew, and acknowledged without a shadow of a doubt, that she had violated Canon 7 after the JCPC issued an adverse unanimous opinion, but chose to take no curative action for fear it would cost her the election.
>
> Second, it strains credulity to believe that Judge Santino never looked at the Facebook webpage she knew was going to be created, when it was available to the public, after she received phone calls from prominent lawyers telling her it was not being "well received," or even, as she said, before telling her campaign consultant to take it down. Nor does this Panel accept Judge Santino's explanation that she was too busy or sleep-deprived to manage, let alone pay attention to her campaign.
>
> Third, the Florida Supreme Court has now been warning judicial candidates about the same type of serious campaign violations at issue for some 20 years. *In re Alley*, 699 So. 2d 1369, 1370 (Fla. 1997); *In re McMillan*, 797 So. 2d [560, 572 (Fla. 2001)]; *In re Kinsey*, 842 So. 2d at 91-92; *In re Renke*, 933 So. 2d [482, 494-96 (Fla. 2006)]. Seminars and forums are regularly conducted in election years, district-wide, presented by the JEAC. An entire pamphlet has been devoted to ensure that every judicial candidate understands Canon 7 and abides by it. Even JEAC 98-27, cited by Giorgio, quoted extensively from *Alley supra*, and warned of the need to carefully craft advertisements to avoid improper pledges, misrepresentations or ***personal attacks***. Candidate Santino's failure to read pertinent case law, or to attend the Palm Beach County seminar does not favor mitigation.

This case arose from both false and misleading statements that Santino made about her opponent in e-mail advertisements and on social media during her 2016 election campaign for the office of County Court Judge for Palm Beach County. In April 2016, the Palm Beach County judge seat became available after the sitting judge resigned. Two candidates for the vacant seat, Gregg Lerman and Tom Baker, petitioned this Court to determine whether the vacancy would be elected or appointed. On June 3, 2016, in *Lerman v. Scott*, No. SC16-783, 2016 WL 3127708 (Fla. June 3, 2016), we determined that the county court vacancy should be filled by election, and Santino then entered the race after the original qualifying period was reopened by this Court.

Santino has been an attorney for fifteen years with a majority of her practice being in probate, guardianship, wills and trusts, and real estate. Santino has no prior disciplinary measure with the Florida Bar. Santino hired Richard Giorgio of Patriot Games, Inc., as her campaign consultant. She testified that she reviewed the judicial canons, attested under oath that she understood all requirements, and received a pamphlet on understanding Canon 7. Nonetheless, Santino admitted that she failed to review any of the case law attached to the pamphlet pertaining to her ethical obligations in her judicial campaign. Furthermore, Santino did not attend the local judicial campaign conduct forums.

On August 30, 2016, Baker was eliminated during the primary election, leaving a runoff between Santino and Lerman. About a month later, on September 23, 2016, a Facebook page titled "The Truth About Gregg Lerman" was posted by Taxpayers for Public Integrity, an electioneering communications organization (ECO) formed and administered by Patriot Games, Inc. *See* Appendix. The header of the Facebook page stated "Attorney Gregg Lerman has made a lot of money trying to free Palm Beach County's worst criminals. Now he's running for judge!" Additionally, the page contained posts that outlined Lerman's representation in four high-profile homicide cases, stating that he chose to represent them and now wishes to be a judge. Lerman testified that he was court appointed on three of the featured cases, and was privately retained for the fourth case. Lerman is on the rotating list of attorneys and is one of the limited number of death penalty qualified attorneys in Florida. He testified that there is a process for the selection of conflict registry counsel and he has provided counsel under that system. Lerman testified that he was on the conflict registry to provide counsel after being appointed to represent indigent defendants if his name was next on the list.

The majority has chosen to omit the photographic evidence of Santino's advertisements. The visual impact of these advertisements, however, says far more

than words could ever convey.  These posts exhibit just how far Santino was willing to go, and how low she was willing to travel to win this election.

The Facebook page remained up for approximately one month, from September 23, 2016, until October 21, 2016.  Santino testified that she was not aware of the content of the Facebook page before it was posted and that, upon her request after being contacted by two prominent attorneys, the page was removed.  Santino testified that she had discussed a Facebook page with Giorgio that would juxtapose the candidates' relative positions.

On October 12, 2016, Santino sent an e-mail that included the statement that her opponent's experience is "limited to criminal defense – representing murderers, rapists, child molesters and other criminals."  On October 12, 2016, Santino's campaign also sent out an e-mail that stated that Lerman's legal practice was "limited to criminal defense – representing murderers, rapists, child molesters and other criminals."  Santino testified and finally admitted at the hearing and in her response to the notice of formal charges that this statement was inappropriate and violated judicial canons.  She testified that Giorgio, her campaign manager, had convinced her it was not a violation because the language was true and Lerman had published this information on his own website.

On October 21, 2016, the *Palm Beach Post* published an article entitled "Facebook New Weapon in Nasty PBC Judicial Race."  On October 25, 2016, a

local attorney filed a complaint about Santino with the Palm Beach County Bar Association's Judicial Campaign Practices Commission (JCPC).[3] In her response to the JCPC complaint filed, Santino defended her actions by indicating that her statements about Lerman's experience were truthful, that the Facebook page was made by an ECO independent of her campaign and was truthful, and that the statements were attempts to highlight differences between Santino and Lerman. On November 2, 2016, less than a week before the general election, the JCPC's advisory opinion unanimously concluded that Santino had violated several provisions of the Judicial Canons, finding that she knowingly misrepresented Lerman's qualifications on numerous occasions, she made inflammatory statements out of context, and she made statements that attempted to lead the voters to choose a candidate based on an alleged predisposition. That same day, the *Palm Beach Post* published an article about the JCPC's findings against Santino. In that article, Santino was quoted defending her actions again, stating, "I appreciate the opinion of the commission; however, as the commission itself discloses in their letter, it is just that–their opinion . . . ." In addition, Santino's

3. The JCPC is an advisory body consisting of lawyers from the Palm Beach Bar Association who attempt to moderate judicial campaigning in the Fifteenth Judicial Circuit by offering advisory opinions about allegations of ethical misconduct by judicial candidates. The JCPC is not a body of the JQC or the Florida Bar.

campaign advisor, Giorgio, described Lerman as "desperate" and characterized the JCPC complaint as "an attempt to generate press for his failing campaign."

On October 27, 2016, the *Palm Beach Post* published another article titled "PBC Court Race Gets Ugly–Some Say–in Donald Trump Like Way." Santino was quoted in the article defending her statements concerning Lerman's choice to represent criminal defendants, stating, "I completely respect and I'm proud of our judicial system and while every person is entitled to a defense, Mr. Lerman is not a public defender and chooses to represent individuals who commit heinous crimes." She further defended her statements by claiming to be pointing out differences between herself and Lerman.

On November 3, 2016, Lerman and Santino were on opposite sides of an early voting site and exchanged words over alleged misrepresentations made to primary voters. Lerman recalled the exchange between them as Lerman stating, "we'll see what the Florida Bar and the JQC has to say about that," to which Santino responded, "it's none of the business of the Florida Bar, the local Palm Beach County Bar or the JQC. It has nothing to do with that. We didn't do anything wrong. I didn't do anything wrong."

On November 8, 2016, Santino defeated Lerman in the general election. Santino never released an apology or a retraction about the statements made before the election on November 8. Santino was sworn in as Palm Beach County Court

Judge on January 3, 2017. After being elected, Santino was questioned at a social gathering with regard to whether misconduct charges could possibly lead to her removal. Santino responded to the effect that "No. I think it will be – won't rise to that. *It will be probably a fine. It's not a big deal . . . .*" (Emphasis added.)

On March 6, 2017, the Investigative Panel of the JQC filed a notice of formal charges against Santino. The charges alleged that Santino made statements that were false or misleading or both about her opponent in advertisements and social media during her campaign for election to judicial office. Additionally, the charges also addressed her defense of these statements in response to the JCPC complaint. In her answer, Santino acknowledged that her comments drawing a distinction between public defenders and private defense attorneys were inappropriate. While explaining that the Facebook page was taken down at her direction, Santino admitted that the statements were inappropriate, wrong, and used language that violated the canons. However, she has continuously denied that the inappropriate conduct represents a clear and present unfitness for office.

Santino testified at the final hearing that all of the conduct alleged in the formal charges occurred in the last three and a half weeks of the campaign. As to the Facebook page, Santino again admitted at the final hearing that the Facebook page was inappropriate and violated the canons. Santino articulated that she had not been aware of the content of the page prior to it being posted and ultimately

had the page taken down, which was after the damage had been inflicted. As to the e-mail sent out by Santino's campaign on October 12, 2016, Santino admitted full responsibility for the language of the e-mail that outlined Lerman's legal practice as "limited to criminal defense – representing murderers, rapists, child molesters and other criminals." When asked by a panel member why she waited until after the election to apologize to Lerman, Santino answered:

> Mr. Lerman, after the election was over, had made it clear that he was going to file a JQC complaint against me, so I did not know how to handle the matter of apologizing to him, and as soon as everything became official, the first thing I discussed with [my lawyer] was apologizing to [Lerman] and apologizing to the JCPC.

Moreover, Santino was asked, "So as a candidate, you never said to the citizens of this county, 'what was on that Facebook page was a violation of the rules I agreed to follow and it was deplorable and atrocious'? Did you ever say anything like that during the campaign at any time." Santino responded that she did not.

As explained above, after the hearing, the Hearing Panel found Santino guilty of violating the Code of Judicial Conduct and the Rules Regulating the Florida Bar, and it recommended a discipline of removal.

Santino is guilty of serious campaign violations that warrant the most severe penalty. Based on this Court's repeated warnings in past cases with regard to this type of campaign behavior, I agree with the approval and confirmation of the JQC's recommendation of removal.

The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission and it may order that the justice or judge be subjected to the appropriate discipline, or be removed from office with termination of compensation for willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.

Art. V, § 12(c)(1), Fla. Const. "Removal is proper when clear and convincing evidence is presented that the judge has engaged in 'conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.'" *In re Hawkins*, 151 So. 3d 1200, 1216 (Fla. 2014) (quoting art. V, § 12(c)(1), Fla. Const.).

I agree with the Court's decision to abide by the JQC's recommendation and remove Santino from the bench for her egregious conduct during her campaign because her decisions throughout her campaign, and her lack of authentic remorse after being investigated and being found to have committed these campaign violations, clearly demonstrated a present total unfitness to serve.

This Court has declared from time immemorial that the lack of bias and partiality is an essential prerequisite to service as a judicial officer. The promise of "Equal Justice Under Law" is essentially predicated upon an independent judiciary committed to fairness and justice in the application of the law to the facts of each individual case. In *Rose v. State*, 601 So. 2d 1181 (Fla. 1992), we reaffirmed this long established and oft-repeated principle in our jurisprudence:

The impartiality of the trial judge must be beyond question. In the words of Chief Justice Terrell:

This Court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an impartial judge. . . . The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.

. . . The attitude of the judge and the atmosphere of the court room should indeed be such that no matter what charge is lodged against a litigant or what cause he is called on to litigate, he can approach the bar with every assurance that he is in a forum where the judicial ermine is everything that it typifies, purity and justice. The guaranty of a fair and impartial trial can mean nothing less than this.

*State ex rel. Davis v. Parks*, 141 Fla. 516, 519-20, 194 So. 613, 615 (1939).

*Id.* at 1183. Accordingly, no other principle is more essential to the fair administration of justice than the impartiality of the presiding judge.

*In re McMillan*, 797 So. 2d at 571.

This Court may order that a judge be removed from office for "conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const.

We examine judicial misconduct for present fitness to hold office "from two perspectives: its effect on the public's trust and confidence in the judiciary as reflected in its impact on the judge's standing in the community, and the degree to which past misconduct points to future misconduct fundamentally inconsistent with the responsibilities of judicial office." [*In re Sloop*, 946 So. 2d 1046, 1055 (Fla. 2006).] To preserve the integrity of the judiciary, a judge

must observe a high standard of personal conduct, [and] "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," . . . . Fla. Code of Jud. Cond. Canons 1, 3. We have repeatedly held that "[r]emoval is an appropriate discipline where the actions of the judge simply '*should* erode confidence in the judiciary,' even where it does not appear that the public has lost confidence, and even where the Hearing Panel has recommended a lesser sanction than removal." *Hawkins*, 151 So. 3d at 1215 (quoting *Sloop*, 946 So. 2d at 1055 (emphasis in original)). *See also In re Henson*, 913 So. 2d [579, 588 (Fla. 2005)] (finding removal appropriate because "the respect of the public [is] essential to [the judiciary's] mission as the third branch of government."); *In re LaMotte*, 341 So. 2d 513, 518 (Fla. 1977) (finding removal proper even where misconduct does not appear to have shaken public faith in the judiciary). Even where a judge has an outstanding record, removal is the appropriate sanction for a judge whose misconduct is fundamentally inconsistent with the responsibilities of judicial office or strikes at the heart of judicial integrity. *See, e.g.*, *In re Graziano*, 696 So. 2d 744, 749 (Fla. 1997); *In re Johnson*, 692 So. 2d 168, 172 (Fla. 1997) ("We cannot dispute Judge Johnson's otherwise unblemished judicial record."); *In re Garrett*, 613 So. 2d 463, 464 (Fla. 1993) (removing Judge Garrett based on one incident of petit theft despite an "unblemished career of public service").

Our inquiry into judicial misconduct must also consider its future implications on the offending judge's ability to serve. Our determinations of appropriate discipline are based in part on the likelihood of that misconduct reoccurring. *Compare, e.g.*, *In re Crowell*, 379 So. 2d 107, 110 (Fla. 1979) (removing Judge Crowell for unfitness "substantially due to his tendency to lose his temper") *and Sloop*, 946 So. 2d at 1059 (removing Judge Sloop because "we [were] unconvinced that [he could] both effectively manage his temper and remain an effective jurist") *with In re Wood*, 720 So. 2d 506, 509 (Fla. 1998) (finding public reprimand appropriate given Judge Wood's candor and commitment to ongoing treatment for anger and stress management). This Court has found removal appropriate even where a judge seeks treatment for a medical condition related to his or her severe misconduct. *See, e.g.*, *Sloop*, 946 So. 2d at 1056 (finding removal appropriate for arresting traffic defendants who were in the wrong courtroom as a result of being misdirected, where the judge blamed his conduct on his Attention Deficit Hyperactivity

- 33 -

Disorder); *Garrett*, 613 So. 2d at 464 (finding removal appropriate for a one-time theft of electronics where the judge suffered from depression). Furthermore, a pattern of misconduct is not necessary for removal. *See Sloop*, 946 So. 2d at 1056; *Garrett*, 613 So. 2d at 464.

*In re Murphy*, 181 So. 3d 1169, 1177-78 (Fla. 2015).

Thus, the first step in the analysis requires examining the effects of Santino's actions on the public's trust in the judiciary. Again, the question is not only whether Santino's campaign misconduct *did* erode the public's confidence in the judiciary, but also whether "the actions of the judge simply '*should* erode confidence in the judiciary,' even where it does not appear that the public has lost confidence" in the judiciary. *In re Hawkins*, 151 So. 3d at 1215 (quoting *In re Sloop*, 946 So. 2d at 1055). Here, it is indisputable that repeated comments indicating Santino's prejudice against criminal defendants and their legal counsel *should*—and does—erode the public's confidence in the fairness and impartiality of members of the judiciary. Santino's campaign used e-mails, news articles, and Facebook posts to target Lerman and to imply his inability to be a good member of the judiciary, based solely on his legal practice as a criminal defense attorney— three cases of which were undertaken based on court appointment from a conflict registry for indigent defendants—a fact that Santino ignored and failed to mention in her smear campaign. These types of misadventures cause the public to lose trust and confidence in the judiciary. *See In re Dempsey*, 29 So. 3d 1030, 1033 (Fla. 2010) ("It is clear that a member of the judiciary or judicial candidate should not

mislead the public by placing factually incorrect statements in campaign materials."); *see also id.* (stating that this Court has "repeatedly placed judicial candidates on notice that this type of misconduct will not be tolerated").

Furthermore, Santino's repeated lack of remorse and her numerous pompous statements to various members of the public defending her misconduct as being beyond reproach further erode the public's confidence in the judiciary. "Given the clear erosion of public confidence in the judiciary caused by [her] misconduct, removal is an appropriate sanction." *In re Murphy*, 181 So. 3d at 1178; *see also id.* at 1177 ("Even where a judge has an outstanding record, removal is the appropriate sanction for a judge whose misconduct is fundamentally inconsistent with the responsibilities of judicial office or strikes at the heart of judicial integrity." (citing *In re Graziano*, 696 So. 2d at 749; *In re Johnson*, 692 So. 2d at 172; *In re Garrett*, 613 So. 2d at 464)).

The next step in the analysis requires an examination of the likelihood of future misconduct. Although there was testimony that Santino served in the civil division, her egregious campaign conduct presented serious issues of fairness and impartiality, should she ever have been assigned to serve in the criminal division of any court. How could criminal defendants believe that Santino would be a fair and impartial arbiter of the law after her comments during her campaign, especially when represented by a private attorney? Every aspect of her judicial campaign

- 35 -

violations demonstrated that Santino's conduct was "fundamentally inconsistent with the responsibilities of judicial office." *In re Graziano*, 696 So. 2d at 753. Moreover, as this Court has repeatedly emphasized, a pattern of misconduct is not a necessary prerequisite for removal. Here, Santino's clean prior record alone could not absolve her of the sanction of removal, given her very public and repeated statements concerning her opinion on private criminal defense attorneys and criminal defendants in general. *In re Graham*, 620 So. 2d 1273, 1276 (Fla. 1993) ("Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary." (quoting *In re Kelly*, 238 So. 2d 565, 566 (Fla. 1970))).

In addition, Santino attempted to justify her poor judgment, stating that she was too busy and sleep deprived to appropriately manage her campaign. I would be remiss, however, to accept this unjustified and feeble justification. Members of the judiciary often face times of high stress, busyness, and sleep deprivation; yet, they are nonetheless expected to maintain appropriate judicial composure during these high-pressure situations. It lends no consolation that, under times of stress, busyness, or sleep deprivation in the future, Santino would potentially lash out

again against criminal defendants and their counsel. Additionally, because Santino may at some point during her time on the bench have been rotated to the criminal division of her court, I cannot say with any degree of certainty that future misconduct was unlikely—especially in times of high stress. Therefore, based on Santino's clear and repeated erosion of public faith in our court system and the unmistakable possibility that she may have repeated this misconduct in the future, I necessarily agree that Santino was presently unfit to serve. *See In re Renke*, 933 So. 2d at 495 ("[O]ne who obtains a [judicial] position by fraud or other serious misconduct . . . is by definition unfit to hold that office.").

This Court also considers mitigating factors when reviewing the recommendations of the JQC, including, among other things, an expression of genuine remorse, acceptance of full responsibility for the actions committed, apologizing to the harmed parties, and seeking treatment or guidance for the problematic behaviors. *In re Contini*, 205 So. 3d 1281, 1284 (Fla. 2016). As I will discuss at length below, however, Santino repeatedly attempted to defend and justify her campaign violations, until the moment when a JQC complaint was filed against her, at which point she decided to apologize to Lerman and the JCPC. Therefore, despite any positive character testimony presented in her favor, I am unpersuaded by the mitigation Santino attempted to present. *In re Murphy*, 181 So. 3d at 1178; *see also id.* at 1177 ("Even where a judge has an outstanding

record, removal is the appropriate sanction for a judge whose misconduct is fundamentally inconsistent with the responsibilities of judicial office or strikes at the heart of judicial integrity." (citing *In re Graziano*, 696 So. 2d at 749; *In re Johnson*, 692 So. 2d at 172; *In re Garrett*, 613 So. 2d at 464)). Furthermore, although the majority attempts to commend the mitigation Santino presented in her favor, this mitigation, in my view, is nothing more than another attempt at rationalizing her campaign misconduct.

Santino attempted to reduce her flagrant misbehavior during her campaign to simple "mistakes" that were caused by the erroneous advice of a ruthless campaign advisor and her failure to attend the local judicial campaign conduct forum sponsored by this Court and the Florida Board of Governors. However, Santino signed a form under oath attesting that she reviewed the judicial canons and understood her obligations under those canons. She also allegedly reviewed a pamphlet she received that explained Canon 7 and discussed campaign pitfalls and restrictions. Nevertheless, she admitted that she failed to review any of the case law attached to the pamphlet pertaining to her ethical obligations in her judicial campaign. Despite having failed to perform her due diligence with regard to her ethical obligations as a judicial candidate, Santino sought to be excused by this Court for her violations. I cannot, however, reconcile Santino's willful blindness with the concept of due diligence or with the obligation of all attorneys and judges

to comport themselves in a manner consistent with the ethical and professional obligations that every single member of The Florida Bar swore an oath to uphold. Further, it was not Santino's "rogue" campaign manager who was responsible for informing her of her ethical obligations during her judicial campaign. The duty to inform herself of the requirements and limitations of judicial election campaigns was Santino's and hers alone, and her reliance on her campaign manager's every word further buttressed her questionable judgment.

In fact, Santino's campaign behavior is exactly the behavior that I cautioned would arise in the aftermath of *In re Kinsey*, when Judge Kinsey was not removed from office as the JQC had recommended. *See* 842 So. 2d at 97-100 (Lewis, J., concurring in part and dissenting in part). *In re Kinsey* involved a series of campaign literature and interviews that portrayed Judge Kinsey as "pro law enforcement" and as a judge who, if elected, would favor victims and police officers over defendants in criminal cases due to her prosecutorial background. *Id.* at 80-85. This Court imposed a $50,000 fine and a public reprimand in response to these campaign violations. *Id.* at 92-93. In my separate opinion, I detailed my frustrations with simply imposing a fine for these very serious campaign violations, specifically predicting that dirty campaign schemes would become the trend in the future, as long as candidates were able to pay the fine. *Id.* at 99 (Lewis, J., concurring in part and dissenting in part).

In my view, the imposition of this fine, the amount of which is clearly designed and intended to represent the enormity of the reprehensible behavior, sends the message to future candidates that they may violate the Code and commit ethical breaches, if they are prepared to pay a monetary fine following the election. The kinds of promises and type of condemnable campaign behavior demonstrated here tarnishes the very purpose for which the judiciary was established—to fairly and impartially consider any and all matters, without preconceived notions or positions about the merits of each case. Judges should not pledge to be prosecutors or defense attorneys; they should pledge to administer the law neutrally and justly. . . . I conclude that if the actions are so reprehensible that the majority believes the imposition of a $50,000 fine is justified, those actions must certainly justify removal from the office so tainted. Selecting an enormous fine as discipline only sends the message that "anything goes" in judicial elections if a candidate has the financial ability to pay the monetary consequences. Indeed, in this era in which many judicial candidates in Florida are able to produce significant campaign funds from donations or personal assets, there may come a day when candidates simply maintain monetary reserves to pay fines following the election and then only the economically powerful can successfully compete in the election process.

*Id.*

To make matters worse, in the instant case, after being sworn in as a Palm Beach County judge, Santino was questioned with regard to whether her misconduct during the election campaign could possibly lead to her removal. Santino's response to this questioning was:

'No. I think it will be – won't rise to that. *It will probably be a fine. It's not a big deal* . . . .'

(Emphasis added.) However, as this Court has repeatedly cautioned in past precedent, I believe that what she has done to obtain the judicial office *is a big*

- 40 -

*deal*. *See In re Renke*, 933 So. 2d at 493-95 (discussing this Court's repeated warnings in past case law concerning campaign violations). I refuse to endorse Santino's "win-at-all-costs-and-pay-the-fine-later" strategy, especially in light of this Court's past warnings and stated intolerance for the kinds of campaign violations at issue here. By her own admission, if this Court simply imposed a fine in an attempt to evidence the enormity of Santino's reprehensible behavior, it would be seen as "no big deal" in her eyes.

Furthermore, Santino asserted that she accepted responsibility for her actions and felt remorse for her conduct during her campaign. However, contrary to her assertion, Santino demonstrated a consistent and repeated lack of remorse and refusal to accept responsibility for her actions throughout her campaign, which this Court has repeatedly deemed to be a sufficient basis for removal. *See In re McMillan*, 797 So. 2d at 572 (citing *In re Shea*, 759 So. 2d 631 (Fla. 2008); *In re Graham*, 620 So. 2d 1273). Specifically, in response to the complaint filed against Santino with the JCPC, Santino responded that her statements concerning her opponent were truthful statements that were meant to highlight the differences between her and Lerman, and that the Facebook posts in question had been created by an ECO.[4] In response to a news article covering her comments concerning

---

4. Although Santino claims that the ECO was responsible for the problematic Facebook posts, this ECO was formed and controlled by Santino's campaign consultant, Patriot Games, Inc. Moreover, the misleading Facebook

- 41 -

Lerman's criminal defense practice, she defended herself by saying that she was simply stating the facts and attempted to draw a distinction between public defenders who represent indigent criminals and private criminal defense attorneys, stating "Lerman is not a public defender *and chooses to represent individuals who commit heinous crimes.*" (Emphasis added.) After the JCPC issued its unanimous advisory opinion finding that Santino had violated several judicial canons, Santino nevertheless continued to attack Lerman for representing persons accused of crimes and made no efforts to retract prior statements or to instruct her campaign manager to conform his behavior to the campaign rules. Additionally, the same day that the JCPC's opinion was issued, Santino was quoted in a news article stating that the JCPC's findings were "just . . . their opinion" and her campaign manager described Lerman as "desperate." While at an early voting site, Santino and Lerman discussed what The Florida Bar and the JQC would say about her campaign comments, and she responded, "It's none of the business of the Florida Bar, the local Palm Beach County Bar, or the JQC. It has nothing to do with that. *We didn't do anything wrong. I didn't do anything wrong.*" (Emphasis added.) In

---

posts about Lerman were clearly under Santino's control, as evidenced by the fact that, when the Facebook posts at issue began to receive negative pushback from prominent attorneys in the area, Santino ordered that the posts be deleted and her request was immediately honored. Thus, despite her attempt at deflecting responsibility, these reprehensible Facebook posts were created by Santino's campaign agents and were the direct product of her election campaign.

sum, Santino's campaign strategy was quite literally one of win-at-all-costs and it's better to beg for forgiveness than to follow the law.

Now, when faced with a JQC investigation and possible removal from the bench, Santino reversed course and attempted to play nice after being caught and being held accountable for her shameful actions. Santino's obvious lack of authentic remorse or genuine apology throughout her campaign and the JQC investigation[5] reflect deep-rooted character flaws that should have, on their own, served as a basis for removal due to her unfitness to serve on the bench. Further, her obvious bias against lawyers who choose engage in criminal defense work, specifically those who represent non-indigent criminal defendants, showed an alarming disregard for the fundamental constitutional values that every judicial

---

5. The JQC was in the best position to determine the genuineness of Santino's asserted remorse. The JQC, however, made it clear that it did not consider Santino's apology after the fact to be a credible one. "It is worth pointing out, however, that [Santino's] acceptance of responsibility, and expressions of remorse came only after the JQC had provided a Notice of Investigation. Throughout her campaign, Santino did not apologize for her campaign's inflammatory and derogatory statements about her opponent. Indeed, time and again, when presented with an opportunity, [Santino] *defended* her misconduct." Because the JQC was in the best position to view Santino, and take into account all of the testimony presented for and against her, I defer to its findings on the credibility and genuineness of her acceptance of responsibility. *See In re Graziano*, 696 So. 2d at 753 ("If the [JQC] findings meet [the clear and convincing evidence] standard, then they are of persuasive force and are given great weight by this Court. This is so because the JQC is in a position to evaluate the testimony and evidence first-hand." (citation omitted)).

- 43 -

officer swears to uphold. *See In re McMillan*, 797 So. 2d at 571 ("[T]he Court has often pointed out that judges should be held to higher ethical standards than lawyers by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system." (citing *In re Boyd*, 308 So. 2d 13, 21 (Fla. 1975))). Therefore, Santino's disingenuous apologies and assertions of remorse did not provide adequate mitigation to persuade me against the sanction of removal. *See In re Graham*, 620 So. 2d at 1276 ("A judge who refuses to recognize his [or her] own transgressions does not deserve the authority or command the respect necessary to judge the transgressions of others.").

Most concerning, however, is that Santino's campaign violations again remind us that this Court's prior precedent with regard to these kinds of violations are being repeatedly ignored, while the conduct itself becomes more and more aggravated. *See In re Renke*, 933 So. 2d at 493-95 (discussing this Court's repeated warnings in past case law concerning campaign violations); *see also In re Angel*, 867 So. 2d 379, 383 (Fla. 2004) ("Certainly, in very egregious cases, where a judge's misconduct included implications that he or she would make partisan decisions on the bench, the JQC has recommended a substantial fine in addition to a public reprimand and *even removal*." (emphasis added) (citing *In re Kinsey*, 842 So. 2d at 92; *In re McMillan*, 797 So. 2d at 572)). In *In re Alley*, this Court addressed these kinds of campaign violations and cautioned future judicial

candidates against their repetition.  699 So. 2d 1369.  Four years later, this Court

again voiced its disapproval of similar, but more egregious, campaign violations in

*In re McMillan*.  797 So. 2d 560.  Then, only two years later, in *In re Kinsey*, the

Court was again faced with even more serious campaign violations that were in the

same vein as those of the cases that preceded it.  842 So. 2d 77.  Now, the Court is

yet again addressing campaign violations similar to those in cases past.  Moreover,

the campaign violations that Santino committed are the most flagrant to date, and

her lack of remorse is the most blatant yet.  Thus, I reemphasize this Court's

previously stated no-tolerance practice in these situations and conclude that the

only result worthy of yet another case involving conduct that ignores our judicial

canons on campaign misconduct was removal.

> In sum, I believe that:

> Chief Justice Terrell's words guaranteeing to all "the cold neutrality of an impartial judge" have special application here where the personal political aspirations and subsequent vindictiveness of an individual judge have been allowed to tarnish the robes of justice. Further, as we attempted to make clear in *In re Alley*, to allow someone who has committed such misconduct during a campaign to attain office to then serve the term of the judgeship obtained by such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins.

*In re McMillan*, 797 So. 2d at 573.  "A judgeship is a position of trust, not a

fiefdom.  Litigants and attorneys should not be made to feel that the disparity of

power between themselves and the judge jeopardizes their right to justice." *In re*

- 45 -

*Graham*, 620 So. 2d at 1277. We must remember lawyers represent citizens when charged with crimes. Some citizens are found to be guilty but others are found not guilty. Who will be there to defend the innocent citizens when wrongly charged by our government if we allow judicial candidates to batter and demean lawyers who afford legal representation? This type of campaign conduct is a full attack on the system of equal justice and the right to counsel.

Accordingly, I agree that Judge Santino's misconduct clearly "demonstrate[d] a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const. Therefore, pursuant to this Court's precedent, removal was not only warranted, it was the only appropriate result. However, for the reasons set forth above, although I concur in the result of Santino's removal, I cannot sign on to a majority that is not fully developed and presented.









POLSTON, J., dissenting.

In this matter involving serious campaign misrepresentations in violation of the Florida Code of Judicial Conduct, I would impose a very severe discipline of a 90-day suspension without pay, a $50,000 fine plus the cost of these proceedings, and a public reprimand. However, unlike the majority, I would not follow the JQC's recommendation of removal because removal is not consistent with our precedent involving this type of serious campaign misconduct. Therefore, I respectfully dissent.

## I. BACKGROUND

On March 6, 2017, the Investigative Panel of the JQC filed a notice of formal charges against Judge Dana Santino. The charges alleged that Judge Santino made false or misleading statements about her opponent in advertisements and social media during her judicial campaign. Additionally, the charges concerned Judge Santino's defense of these statements in response to a complaint filed with the Palm Beach County Bar Association's Judicial Campaign Practices Commission (JCPC). In her answer, Judge Santino acknowledged that her comments were inappropriate, and she expressed regret for them. She explained that the Facebook page that was viewable for approximately one month was taken down at her direction. And Judge Santino acknowledged that the statements were

- 51 -

inappropriate and violated the canons. However, she denied that those mistakes represent a clear and present unfitness for office.

On August 2, 2017, a final hearing was held before the Hearing Panel of the JQC. Santino's opponent for judicial office, Gregg Lerman, testified that he dealt with the other candidate for the seat "on an extremely friendly and personal basis" and "took the position with Ms. Santino that I not deal with her at all." Lerman testified that he "was admittedly unhappy that she was running on [his] dime, to put it bluntly, because [he] had been the one to sue the governor and paid the fees to sue the governor, and she jumped in after that." Lerman also was asked about derogatory statements he made about Judge Santino during the campaign. Specifically, when asked whether he commented, "I don't have the luxury of being an attractive woman riding on my husband's coattails," Lerman answered that he said something to that effect. Additionally, on the night of the primary, Lerman gave an interview where he stated that "the gloves are going to come off in the upcoming months." Shortly after, Lerman sent an email that stated, "I need your help in order to protect the integrity of the bench from becoming a vanity prize."

Judge Santino testified at the final hearing that all of the conduct alleged in the formal charges occurred in the last three and a half weeks of the campaign. As to the Facebook page, Judge Santino testified at the final hearing that the Facebook page was inappropriate and violated the canons. Judge Santino articulated that she

had not been aware of the content of the page prior to it being posted and had the page taken down immediately when she learned of its existence. As to the email sent out by her campaign on October 12, 2016, Judge Santino admitted full responsibility for its language. Judge Santino testified that in the 5 days between the release of the JCPC advisory opinion and the final day of voting in the election on November 8, 2016, she did not release an apology or a retraction about the statements she had previously made or fire her campaign manager. However, Santino testified that she sent apology letters to Lerman and the members of the JCPC after the election was over.

Additionally, the Hearing Panel of the JQC heard testimony from witnesses on behalf of Judge Santino. Judge Jeffrey Colbath testified that he was serving as the Chief Judge of the Fifteenth Judicial Circuit when Judge Santino became a sitting judge in January 2018. Judge Colbath testified that he never got any complaints about Santino and that she volunteered to help out colleagues. Judge Colbath testified that Judge Santino volunteers for weekend civil drug court that carries no extra compensation. When asked if Judge Santino was presently fit to sit as a county court judge, Judge Colbath stated, "I think she's presently fit. I think what's happened is unfortunate and worthy of your attention and consideration, but as far as her ability to do her job not only efficiently, but exemplary in the Palm Beach County Courthouse, I think she's good to go."

Judge Theodore Booras, who has served as a Palm Beach County Judge for 11 years, testified that he has known Judge Santino since 1993, when he was an assistant state attorney and she worked as a probation officer. Judge Booras testified that he also worked with Judge Santino when she worked for a community-based drug treatment program where she advocated for eligible individuals to be offered diversion programs. Judge Booras acted as Judge Santino's unofficial mentor in the civil division. Judge Booras testified that Judge Santino has a strong work ethic, is helpful to colleagues, well-regarded by practitioners, and has worked hard to manage her caseload. When asked about Judge Santino's fitness to serve as a judge, Judge Booras stated that Judge Santino is an excellent judge. The Hearing Panel also heard testimony from two lay witnesses who gave exemplary character references for Judge Santino.

As detailed by the majority, the Hearing Panel concluded that Judge Santino's statements violated Canon 7 of the Florida Code of Judicial Conduct, and it recommended her removal from office.

## II. ANALYSIS

While I agree with the JQC and the majority that Judge Santino is guilty of serious campaign violations that warrant a severe penalty, I disagree with removal.

"The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission and it may order

- 54 -

that the justice or judge be subjected to appropriate discipline, or be removed from office with termination of compensation for willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary *demonstrating a present unfitness to hold office. . . .* " Art. V, § 12(c)(1), Fla. Const. (emphasis added). "Removal is proper when clear and convincing evidence is present that the judge has engaged in 'conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.' " *In re Hawkins*, 151 So. 3d 1200, 1216 (Fla. 2014) (quoting Art. V, § 12(c)(1), Fla. Const.).

This Court's imposition of removal in prior cases involving Canon 7 violations was dependent on misconduct in addition to campaign misrepresentations. *See, e.g., In re Renke*, 933 So. 2d 482 (Fla. 2006); *In re McMillan*, 797 So. 2d 560 (Fla. 2001). In *In re McMillan*, this Court ordered removal after Judge McMillan committed serious violations while campaigning and committed additional violations while a sitting judge. 797 So. 2d at 573. During his campaign, Judge McMillan represented that he would favor the State and police in court proceedings and would side against the defense. *Id.* at 562. The JQC further alleged that, after taking the bench, Judge McMillan violated the canons when he presided over the first appearance of a DUI case that he personally witnessed and provided a statement to the police, a clear conflict of interest. *Id.* at 564. While acknowledging the severity of Judge McMillan's improper and

- 55 -

misleading campaign tactics, this Court explained that his conduct "after he became a judge also places this case in a different category." *Id.* at 572. This Court concluded that the "combined effect of the proven misconduct, culminating in a blatant breach of the fundamental principles of judicial ethics while sitting as a judge, demonstrate Judge McMillan's lack of fitness for office." *Id.* at 573.

This Court was once again faced with campaign misrepresentations plus additional conduct in *In re Renke*, 933 So. 2d at 484. In his campaign materials, Judge Renke misrepresented that he was an incumbent, misrepresented his position on the Southwest Florida Water Management District, misrepresented his judicial experience, misrepresented endorsements, misrepresented his experience as a lawyer, and misrepresented the qualifications of his opponent. *Id.* at 485-86. Additionally, Judge Renke accepted illegal donations from his father, disguised as compensation, in violation of state finance laws. *Id.* at 495. In concluding that Judge Renke was presently unfit to hold office, which warranted removal, this Court explained that "[t]he JQC's finding of guilt on the severe campaign finance improprieties evidenced here, when coupled with Judge Renke's efforts to mislead the voting public as to his experience and qualifications to serve as judge, lead us to conclude that his conduct during his judicial campaign was 'fundamentally inconsistent with the responsibilities of judicial office.' " *Id.* at 495. (quoting *In re Graziano*, 696 So. 2d 744, 753 (Fla. 1997)).

More recently, in *In re DuPont*, 43 Fla. L. Weekly S337 (Fla. Sept. 6, 2018), this Court determined that removal was appropriate where the judge not only committed violations by making inappropriate campaign statements but also committed violations while serving on the bench. While campaigning, Judge DuPont falsely claimed that his opponent's wife and daughter had been arrested multiple times, improperly implied that his opponent changed his name to hide his past, falsely asserted that his opponent received a traffic ticket for passing a school bus with children on it, and inappropriately promised to never find a statute unconstitutional. *Id.* at S337-40. However, in addition to these wrongful campaign statements, Judge DuPont also violated the canons by conducting first appearance hearings earlier than his judicial assistant had advised and when there were no lawyers present for the State or the defendants. *Id.* at S340. And during a hearing involving support for a minor child, he ordered a deputy to search a party and to seize any money found after the party asserted an inability to pay for a parenting class. *Id.* at S387. Further, the Chief Judge of the Seventh Judicial Circuit "testified that he received *far* more complaints about Judge Dupont than any other judge." *Id.* at S340. In *In re DuPont,* this Court explained that "[b]ased on the misrepresentations Judge DuPont made during his campaign to attain his office as well as the other instances of misconduct during his time in office, we

conclude that Judge DuPont has demonstrated a present unfitness to hold office and approve the recommended discipline of removal from office." *Id.* at S342.

In contrast, in determining the appropriate discipline in a case involving only serious improper campaign statements, in *In re Kinsey*, 842 So. 2d 77 (Fla. 2003), this Court affirmed a public reprimand, fine of $50,000, and the cost of the proceedings. During her campaign, Judge Kinsey distributed campaign literature aligning herself with law enforcement, including several pamphlets that proclaimed a judge's role was to protect victims and put criminals behind bars in support of law enforcement. *Id.* at 80-85. Specifically, Judge Kinsey included a brochure where she was "standing with ten heavily armed police officers that was captioned 'Who do these guys count on to back them up?' " *Id.* at 87. In determining Judge Kinsey's present fitness in relation to the violations, this Court explained that "[w]hile a reprimand alone is insufficient, there was no evidence that Judge Kinsey is presently unfit to hold office other than her misconduct involved in winning the election." *Id.* at 92 (quoting JQC findings). This Court supported the decision of a $50,000 fine, noting that this severe penalty was "to warn any future judicial candidates that this Court will not tolerate improper campaign statements which imply that, if elected, the judicial candidate will favor one group of citizens over another or will make rulings based upon the sway of popular sentiment in the community." *Id.* Accordingly, this Court determined that

the appropriate discipline was a $50,000 fine, proceeding costs, and a public reprimand. *Id.*

The misconduct detailed in *In re Kinsey* is similar to the misconduct involved in the present case. In *In re Kinsey*, this Court determined that removal was not warranted when the judge utilized campaign materials to make improper campaign statements that implied she would favor a particular group in her rulings. *See In re Kinsey*, 842 So. 2d at 92. Here, Judge Santino utilized a Facebook page and a campaign e-mail to make improper statements regarding her opponent's favoring of a particular group. Thus, similar to the discipline appropriate in *In re Kinsey*, Judge Santino's conduct warrants discipline other than removal.

Unlike this Court's prior election cases ordering removal, Judge Santino's misconduct is limited to campaign misrepresentations. It is undisputed that Judge Santino engaged in conduct amounting to serious campaign violations. The posted Facebook page suggested that Lerman was unfit as he was pro-defense, highlighting his extensive experience in criminal defense. Additionally, Santino's campaign e-mail framed her opponent's experience as "limited to criminal defense-representing murderers, rapists, child molesters and other criminals." However, this Court's prior cases resulting in removal for improper campaign statements involved additional misconduct by the judge. Judge Santino's misconduct does not rise to that level. Unlike the judge in *In re Renke*, Judge

Santino did not commit serious campaign finance violations that amounted to illegal conduct. *In re Renke*, 933 So. 2d at 484. Additionally, unlike the judge in *In re McMillan* or the judge in *In re DuPont*, Judge Santino did not commit any violations upon taking the bench that would suggest a present unfitness for office. *In re McMillian*, 797 So. 2d at 565; *In re DuPont*, 43 Fla. L. Weekly at S338, S341-42. Because Judge Santino committed serious campaign misrepresentations without some additional misconduct establishing present unfitness, the recommendation of removal is not the appropriate discipline.

To be clear, the nature of Judge Santino's misconduct should be central to our analysis, but this Court also considers mitigating factors when reviewing the recommendation of the JQC. *See In re Eriksson*, 36 So. 3d 580, 595 (Fla. 2010). While acknowledging the severity of Judge Santino's improper and misleading campaign tactics, her conduct after becoming a judge aids in the determination of present fitness for office. Judge Santino accepted full responsibility for her actions at every stage of these proceedings. Although it was a contentious election, as evidenced by the record, Santino did not attempt to excuse her conduct during the hearing and did not attempt to justify her actions in her two briefs to this Court. Additionally, after the election, Judge Santino sent apology letters to Lerman and the members of the JCPC. *See In re Davey*, 645 So. 2d 398, 405 (Fla. 1994) ("Where a judge admits wrongdoing and expresses remorse before the

Commission, this candor reflects positively on his or her present fitness to hold office and can mitigate to some extent a finding of misconduct.").

This mitigation is considered alongside the exemplary character testimony received at the hearing. Judge Colbath, who served as the Chief Judge when Judge Santino joined the Fifteenth Judicial Circuit, testified that in his opinion, Judge Santino was presently fit to sit as a county court judge, pointing to her efficient and exemplary work at the courthouse. Additionally, Judge Booras, from the civil division, opined that Judge Santino is an excellent judge who has a strong work ethic, is helpful to colleagues, and well-regarded by practitioners.

Accordingly, Judge Santino's misconduct, although serious, is not sufficient to "demonstrate[] a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const. Therefore, a severe penalty rather than removal is warranted.

## III. CONCLUSION

Based on our prior precedent involving serious and improper campaign statements but no additional misconduct, I would suspend Judge Santino without pay for 90 days, order her to pay a fine of $50,000, plus the costs of these proceedings, and remand this case to the JQC for a determination of the amount of such costs. Accordingly, I respectfully dissent.

CANADY, C.J., concurs.

Original Proceeding – Judicial Qualifications Commission

Eugene Pettis, Chair, Fort Lauderdale, Florida, Michael Louis Schneider, Executive Director and General Counsel, Alexander J. Williams, Assistant General Counsel, Judicial Qualifications Commission, Tallahassee, Florida; and Lauri Waldman Ross of Ross & Girten, Counsel to the Hearing Panel of the Florida Judicial Qualifications Commission, Miami, Florida,

   for Florida Judicial Qualifications Commission, Petitioner

Jeremy J. Kroll of Bogenschutz, Dutko & Kroll, P.A., Fort Lauderdale, Florida,

   for Judge Dana Marie Santino, Respondent